[No. G045246. Fourth Dist., Div. Three. Oct. 29, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS ALBERTO OTERO, Defendant and Appellant.

866

**COUNSEL**

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles Ragland and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOORE, J.**—We find the prosecutor's use of a diagram of California to explain proof beyond a reasonable doubt was misconduct. Given the brief reference to the diagram, the court's instruction to the jury to disregard the diagram, and the substantial evidence in this case, we find the misconduct was harmless. We publish this opinion due to the number of cases that come before us wherein prosecutors have used similar diagrams or puzzles in connection with arguments about proof beyond a reasonable doubt. The manner in which these diagrams or puzzles are used trivializes the prosecution's burden to prove each element of a charged offense beyond a reasonable doubt and if their use continues, eventually the error will be prejudicial and result in a reversal of a conviction.

I

FACTS

An amended information filed in the Orange County Superior Court charged defendant Luis Alberto Otero with four sex offenses against a child. He was charged in count one with aggravated sexual assault on a child under 14 years old and more than 10 years younger than defendant (Pen. Code,[1] § 269, subd. (a)(3)). The information provided additional notice to defendant by specifying the offense was committed by an act of sodomy at an apartment complex. Count two also alleged a violation of section 269, subdivision (a)(3) during the same time period (between Nov. 1, 2004, and May 1, 2007) and stated the offense was committed by an act of sodomy in an alley. Count three alleged a lewd act on a child under 14 years of age (§ 288, subd. (a)) between April 8, 2003, and May 1, 2007, and consisted of a touching of the victim's vagina. Count four also charged a violation of section 288, subdivision (a) during the same time period and alleged the violation consisted of a separate touching of the victim's vagina.

O. was 14 years old at the time of trial. Defendant and O. are cousins. When O. was younger, she lived in an apartment in Santa Ana. Her maternal aunt, defendant's mother, lived in a nearby apartment with her children,

---

[1] All statutory references are to the Penal Code unless otherwise stated.

including defendant. O. and her family used to live in an apartment on the same street as her aunt and her aunt's family.

Defendant's mother used to babysit O. when O. was six to nine years old. O. said when she was six years old defendant touched her in her "private place" where she goes "pee." Defendant touched her there more than once. The touching was skin to skin and continued when she was nine years old. On one occasion, O. was playing outside her apartment with friends when defendant asked her if she wanted to go to the 7-Eleven to get a Slurpee. O. left her friends and walked with defendant toward the 7-Eleven. On the way, they turned into an alley where defendant began touching O.'s vaginal area with his hand. He also touched her backside. O. did not remember if defendant did anything else to her that day and did not remember telling a social worker defendant touched her bottom with his penis, but she did talk with a social worker and said she was honest in that conversation.

O. also testified about an incident in her apartment complex where defendant sodomized her by an elevator when she was nine years old. O. was not sure if the elevator incident happened before or after the incident in the alley.

A recording of O.'s interview by the social worker was played for the jury. During that interview, O. said the first time defendant touched her vaginal area with his hand, skin to skin, was when she was six years old and doing homework at the kitchen table in her aunt's house. She said that was the only time defendant touched her like that while she was six, but the touching resumed when she was nine years old. There was a time when she was nine, at her aunt's residence, and she locked herself in her aunt's bedroom. Defendant had a key to the bedroom, opened the door, and carried O. to the bed, where he started touching her. He again touched her vaginal area underneath her clothing.

O. also told the social worker defendant put his penis in her "butt" while they were in the alley on the way to the 7-Eleven. It hurt when he penetrated her. While O. denied any other incident of sodomy to the social worker, defendant confessed to police he sodomized O. once by an elevator after he had smoked some marijuana. A police officer who interviewed O. testified she told him about being molested by defendant since she was six years old and that defendant sodomized her twice since she was nine years old. She said the second time was on the way to the 7-Eleven.

Police interrogated defendant on May 9, 2007. Defendant waived his *Miranda*[2] rights and agreed to talk with the police. At first, defendant denied ever having sex with O. and said it would be wrong because she is a little girl. Later, he admitted having sodomized her on one occasion. He said it happened two years earlier, when he was 19 years old. Defendant said he had been to see his girlfriend and on his way home he obtained some marijuana and got high. He saw O. outside her residence. She told him she liked a boy and they wanted to have sex. She asked defendant if anal sex hurt. He said he did not know. He put his penis in her anus and withdrew it when O. said it hurt. Defendant said the incident occurred by an elevator.

Defendant consented to the police searching his wallet. It contained photographs of other little girls. He said the girls were 13 or 14 years old and they had given him the photographs when he was under 18. Also in the wallet was an advertisement, from a pornographic magazine, for teen girls. Defendant admitted having called the telephone number in the advertisement once, but said he did not get through because it required a credit card number and he did not have one.

The jury found defendant guilty of each charge. The court sentenced defendant to two consecutive terms of 15 years to life and a consecutive eight-year determinate term.

## II

## DISCUSSION

During argument, the prosecutor told the jury she wanted to give them an example of reasonable doubt. She used a PowerPoint diagram. At the top of the diagram in large bold print were the words "No Reasonable Doubt." The diagram consisted of the outlines of California and Nevada. In southern Nevada was a dollar sign. "Ocean" was printed to the left of California. "San Diego" was printed inside California, but it was printed in the northern part of the state. Below "San Diego" was a star and the word "Sac." Below that was "San Francisco." In Southern California was "Los Angeles." The following statement was at the bottom of the diagram: "Even with incomplete and incorrect information, no reasonable doubt that this is California."

Using the diagram, the prosecutor argued to the jury: "I'm thinking of a state and it's shaped like this. And there's an ocean to the left of it, and I know that there's another state that abuts this state where there's gambling. Okay. And this state that I'm thinking about, right in the center of the state is

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

a city called San Francisco, and in the southern portion of the state is a city called Los Angeles. And I think the capital is Sac-something. And up at the northern part of the state there's a city called San Diego. I'm just trying to figure out what state this might be."

"Is there any doubt in your mind, ladies and gentlemen, that that state is California? Okay. Yes, there's inaccurate information. I know San Diego is not at the northern part of California, and I know Los Angeles isn't at the southern. Okay. But my point to you in this—"

At that point defense counsel objected. Outside of the jurors' presence, the court described the PowerPoint diagram used by the prosecutor. The court stated its intent to give a curative instruction and to have the PowerPoint slide taken down and not referred to again. The court then instructed the jury to disregard the diagram, explaining that "people try to explain reasonable doubt in different ways, and nobody has done anything wrong, but I've defined for you what reasonable doubt is in the instruction, and you're to decide what reasonable doubt is following that instruction." The prosecutor then made a one-paragraph argument why the evidence in the case left no reasonable doubt, ending her argument without any further reference to the diagram. Defendant contends the prosecutor's argument amounted to misconduct and requires reversal because the argument lessened the prosecution's burden to prove the offenses beyond a reasonable doubt. We agree the argument was misconduct, but find the error harmless in light of the court's instructions, including the curative instruction given as the result of defendant's objection to the argument and use of the diagram.

■ "[O]n claims of prosecutorial misconduct our state law standards differ from those under the federal Constitution. With respect to the latter, conduct by the prosecutor constitutes prosecutorial misconduct only if it ' " ' "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." ' " ' [Citations.] By contrast, our state law considers it misconduct when a prosecutor uses ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citations.] . . . 'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law, however, 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071 [81 Cal.Rptr.3d 651, 189 P.3d 911].)

It is misconduct for a prosecutor to misstate the law during argument. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21 [41 Cal.Rptr.3d 593, 131 P.3d 995].) This is particularly so when misstatement attempts "to

absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 831 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

*People v. Katzenberger* (2009) 178 Cal.App.4th 1260 [101 Cal.Rptr.3d 122], presented an analogous situation to that presented here. In *Katzenberger*, the prosecutor addressed the jury on the issue of proof beyond a reasonable doubt and used a PowerPoint presentation to make her point. When the program was started, six puzzle pieces came onto the screen sequentially. The puzzle was of the Statue of Liberty. The appellate court noted the image was *immediately* and easily recognized. The PowerPoint presentation stopped after six of the eight puzzle pieces were in place. During the presentation, the prosecutor told the jury they all knew what the puzzle depicted without the need of all the pieces of the puzzle. The defense objected to the argument and use of the PowerPoint presentation because it demeaned the reasonable doubt instruction. (*Id.* at pp. 1264–1265.)

The appellate court first reviewed a case from New York, *People v. Wilds* (N.Y.App.Div. 1988) 141 A.D.2d 395 [529 N.Y.S.2d 325], wherein the trial judge used a jigsaw puzzle of Abraham Lincoln to illustrate the judge's point that the jury need not have all of its questions answered in order to convict the defendant. (*People v. Katzenberger, supra*, 178 Cal.App.4th at p. 1266.) The New York appellate court found the trial court erred in its demonstration because " 'the average American juror would recognize a jigsaw puzzle of Abraham Lincoln long before all the pieces are in place. Obviously, this is not the quantum of proof required in a criminal case.' [Citation.]" (*Ibid.*) The *Katzenberger* court concluded that just as the average juror would recognize the picture of Abraham Lincoln before all the pieces of the puzzle were in place, the image of the Statue of Liberty would be recognized by most jurors "well before the initial six pieces are in place." (*Id.* at p. 1267.) The court concluded, "The presentation, with the prosecutor's accompanying argument, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence. It invites the jury to guess or jump to a conclusion, a process *completely at odds* with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Ibid.*, italics added.)

The court found an additional problem with the prosecutor's use of the puzzle. (*People v. Katzenberger, supra*, 178 Cal.App.4th at p. 1267.) After reviewing two appellate decisions from out of state, the court found the prosecutor's argument contained an improper quantitative component. (*Ibid.*) By using an eight-piece puzzle and arguing the puzzle is solved after only six of the pieces are in place, the prosecutor in effect "inappropriately suggest[ed] a specific quantitative measure of reasonable doubt, i.e., 75 percent."

(*Id.* at p. 1268.) The court concluded "[t]he prosecutor's use of an easily recognizable iconic image along with the suggestion of a quantitative measure of reasonable doubt combined to convey an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt." (*Ibid.*)

Although the prosecutor in this matter did not use a jigsaw puzzle and it could be argued she did not introduce a quantitative measure of proof beyond a reasonable doubt, the PowerPoint slide used an immediately recognizable icon. The slide contained the outlines of California and Nevada in their geographical juxtaposition. The prosecutor told the jury she was looking for the name of a state. Apparently pointing to the outline of California, the prosecutor said the state she was thinking of was "shaped like this." At that point without considering anything else on the slide—including the statement at the bottom of the slide ("Even with incomplete and incorrect information, no reasonable doubt that this is California.")—we think every juror knew the state was California.

The prosecutor went on to say the state she was thinking of was bordered on the left by an ocean and on the right by a state that permitted gambling. In southern Nevada was a dollar sign, apparently signifying Las Vegas. As if she was supplying further pieces to a puzzle, she said the state she was thinking of has a capital named "Sac-something," and contains the cities of San Francisco, Los Angeles and San Diego. Inside the diagram of California, in roughly the position of Sacramento, was a star and adjacent to the star was "Sac." Stars are commonly used on maps to designate capitals. The diagram of California also contained "San Diego," "San Francisco," and "Los Angeles," although "San Diego" was placed in Northern California.

As was done in *Katzenberger*, "[t]he presentation, with the prosecutor's accompanying argument, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence. It invites the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*People v. Katzenberger, supra,* 178 Cal.App.4th at p. 1267.)

We do not think a quantitative aspect is required before it may be said the reasonable doubt standard has been demeaned. But just as the flawed puzzle procedure in *Katzenberger* had eight pieces, so too did the diagram in this matter have eight components: (1) the outline of California; (2) the outline of Nevada; (3) a dollar sign inside Nevada, symbolizing gambling and/or Las Vegas; (4) the word "Ocean" where the Pacific Ocean would be; (5) a star with the word "Sac" where Sacramento would be; (6) "San Francisco" inside

California, albeit in the wrong place; (7) "San Diego" inside of California, also in the wrong place; and (8) "Los Angeles" in Southern California. To the extent the prosecutor told the jury she was looking for a state that "looks like this," apparently pointing to the outline of California, every one of the jurors needed only one-eighth of the information on the slide: the readily recognized outline of California.

In *Katzenberger*, the puzzle was identifiable when six of eight puzzle pieces were in place and "the prosecutor told the jury, 'this picture is beyond a reasonable doubt,' inappropriately suggesting a specific quantitative measure of reasonable doubt, i.e., 75 percent." (*People v. Katzenberger, supra*, 178 Cal.App.4th at p. 1268.) The use of a diagram such as the one used in this case is simply not an accurate analogy to a prosecutor's burden to prove beyond a reasonable doubt each and every element of a charged offense. Here the diagram was identifiable using but one of eight pieces of information supplied by the diagram (12.5 percent of the information supplied) and unlike the puzzle in *Katzenberger*, where all pieces contained accurate information, here the diagram contained inaccurate information, making the error more egregious. Not only is the standard of proof reduced to substantially below the condemned percentage in *Katzenberger*, but the jury was informed that reasonable doubt may be reached on such slight proof even when some of the evidence is demonstrably false.

The prosecutor committed misconduct.[3] The error in this case, however, was harmless. The court ordered the diagram taken down as soon as defense counsel objected and admonished the jury to disregard it. There is no reason to believe the jury did not abide by the admonishment. (*People v. Jones* (1997) 15 Cal.4th 119, 168 [61 Cal.Rptr.2d 386, 931 P.2d 960] (plur. opn. of George, C. J.) [we assume the jury followed the admonishment], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Additionally, the court properly instructed the jury on the standard of proof and we presume the jury followed the court's instruction. "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717 [55 Cal.Rptr.2d 26, 919 P.2d 640].) What is more, this was not a close case. Defendant not only admitted one of the

---

[3] We do not address whether the PowerPoint would have been properly used to address other questions such as how circumstantial evidence works or the fact evidence can have some convincing force even if the evidence is flawed.

charged offenses (the sodomy by the elevator) in his statement to the police, the paperwork in his wallet also demonstrated his sexual interest in young girls.

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall, supra,* 13 Cal.4th at p. 831.) " '[E]xperiments,' including mere graphs, lines, charts, or Power Point presentations, may imperil a prosecutor's attempt to establish the concept of guilt beyond a reasonable doubt. [Citation.]" (*Adcock v. State* (Ind.Ct.App. 2010) 933 N.E.2d 21, 28, fn. 6, citing *People v. Katzenberger, supra,* 178 Cal.App.4th at p. 1269.) Prosecutors would be wise to avoid such devices. Otherwise a conviction on a closer case may be jeopardized, especially. if the trial court does not sustain defense counsel's objection to the argument and fails to advise the jury to disregard the objected to presentation.

### III

The judgment is affirmed.

### DISPOSITION

Bedsworth, Acting P. J., and Ikola, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 30, 2013, S207176.