Filed 2/7/14  P. v. Ocampo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047321 |
| v. | (Super. Ct. No. 11CF1514) |
| ALFREDO OCAMPO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

William W. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Alfredo Ocampo of one count of arson (Pen. Code, § 451, subd. (d)). The court sentenced him to a term of 8 months, and imposed restitution and parole revocation fines.

Ocampo argues the prosecutor committed misconduct by shifting the burden of proof and by comparing the reasonable doubt standard to a jigsaw puzzle. He also contends the court erred when it failed to exclude evidence of his other crimes and that his trial lawyer's failure to object to admission of that evidence and ask for a limiting instruction constituted ineffective assistance of counsel. Finally, he asserts cumulative error.

We affirm.

## FACTS

Several months after Jennifer Bird bought a car she began having trouble making payments. Regina Del Real, who at the time was in a romantic relationship with Bird, made payments on the car for almost a year. In August 2010 the two talked about getting rid of the car to put an end to the payments. Bird thought her insurance company might pay off the loan if the car was stolen. Del Real contacted a friend, Crystal Heras, and offered to pay her $500 or so to dispose of the car. Heras told Del Real she knew someone who could do it.

Heras spoke to Andrew Valdez who, after initially declining to become involved, finally agreed to do so out of sympathy for Bird. Valdez contacted Ocampo. Valdez thought Ocampo might be interested in doing the job because Ocampo frequently asked Valdez if he knew anyone who wanted stereo sound systems or speakers. Valdez thought the products were stolen because they were used and looked like they had been taken from cars. Valdez "figured [Ocampo] has a small record of knowing how to take things." Ocampo agreed to dispose of the car.

Late at night on August 14, 2010 Del Real parked the car in an industrial area on Yale Street in Santa Ana. She gave $500 and the car keys to Heras. Del Real and Bird then left for Las Vegas. Heras gave the keys and the money to Valdez; Valdez then gave the keys to Ocampo.

At about 1:30 a.m. on August 15, Captain Pedro Roselle of the Santa Ana Fire Department responded to a call about a vehicle fire on Yale Street in Santa Ana, an industrial area. Roselle saw a torn piece of cloth stuck in the fuel tank, which could have evidenced arson. The cloth was part of a pair of underwear. Forensic analysis revealed DNA on the cloth came from at least four different people, the most significant being from a female, whose DNA was also on the flap to the gas cap.

While at the scene, Roselle saw two women standing on a corner near the car; the car was visible from that location. He thought they might have something to do with the car and expected them to approach him but they left. He also saw two different cars driving away from the scene after the fire was out.

Around 2:00 a.m. on August 15, Ocampo was treated in an emergency room by Dr. True McMahan for second degree burns on his face. Ocampo told McMahan he had suffered the burns about 20 minutes before arriving at the hospital. This was within 30 minutes of the time Roselle arrived at the car fire. There was testimony the hospital was about six and a half miles from the location of the fire and about 15 minutes' drive time away.

Dr. McMahan had extensive experience treating burn victims. Ocampo told her he had been cooking for his girlfriend and oil in a frying pan had caused a fire that burned him about 20 minutes' prior. Dr. McMahan observed no oil on Ocampo's face. Ocampo's girlfriend arrived at the hospital later. Ocampo's brother, with whom he lived, told investigators that Ocampo had said his burns came from a friend's barbeque.

3

The day after the fire Bird reported her car as stolen. An automotive forensic examiner hired by Bird's insurance company examined the burned car and determined there had been no forced entry or damage to the ignition lock. It was his opinion a key had been used to gain entry into the car and to start the car to drive it to Yale Street.

Fire Captain William Lackey investigated the burnt car. He believed the fire had started in the passenger compartment of the car, "which was completely burned." He detected an ignitable liquid in the driver's side of the passenger compartment. Lackey testified the liquid could have caused a flash fire, i.e., a fire caused by all the vapors exploding at once. Flash fires generally cause first or second degree burns to anyone nearby.

Lackey also found a rag in the gas tank, which "appeared to [have been] . . . an attempt to provide a wick for a fire." It was his opinion the fire had been set intentionally. The only thing missing from the car was the stereo system.

Lackey spoke with Bird three times during his investigation. She told him she was in Las Vegas at the time of the fire. She said she had left the car with a friend who lived in Pico Rivera while she was gone but had given the key to a different friend. She initially refused to divulge the name of the friend to whom she had given the key. She later told him the friend's name was Caitlin Macrery.

Records of text messages between Macrery and Bird showed that after Bird spoke to Lackey she asked Macrery to take the key and corroborate the information she had given Lackey. Bird told Macrery she could go to jail if Macrery did not help her.

Bird initially told Lackey that when she returned home from Las Vegas and went to her friend's house in Pico Rivera to pick up her car and she discovered it was gone, she called 911. Her cell phone records showed she made the call in Vernon, not Pico Rivera.

4

Valdez and Heras testified they had been given immunity. Bird was convicted of making a fraudulent statement to her insurance company with the intent to commit fraud and aiding and abetting arson, felonies. Del Real pleaded guilty to a misdemeanor, destroying another's property by arson.

**DISCUSSION**

*1. Prosecutorial Misconduct*

Ocampo asserts the prosecutor engaged in two instances of misconduct during the rebuttal portion of closing argument. Neither claim has merit.

*a. Applicable Law*

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such "'unfairness as to make the resulting conviction a denial of due process."' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and "'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct'" [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

To preserve a claim of prosecutorial misconduct for appeal, a defendant must timely object and request the court admonish the jury. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) Otherwise, generally, the claim is forfeited. (*People v. Earp* (1999) 20 Cal.4th 826, 858.) However, "[a] failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

"'When a claim of misconduct is based on the prosecutor's comments before the jury, as all defendant's claims are, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citations.]'" (*People v. Linton, supra,* 56 Cal.4th at p. 1205.) "[W]e 'do not lightly infer' that the jury drew the most damaging rather than the

5

least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

> b. *Comment About Lack of Evidence Supporting Ocampo's Explanation of His Burns*

Ocampo argues the prosecutor committed misconduct in rebuttal when she questioned the lack of supporting evidence for Ocampo's explanation of how he was burned. She stated: "You have [Ocampo's] statements . . . indicating that the burns were received only 20 minutes beforehand, and then you have his unreasonable explanation how these burns got on his face. [¶] Now let's talk about reasonableness. If you were to go ahead and follow what it is he would like you to believe, where is the supporting evidence? Who is here to tell us any fact that's how he got those burns? [¶] [Defense counsel]: Objection. Burden shifting. [¶] The Court: Overruled. [¶] Go ahead. [¶] [Prosecutor]: Where is the evidence? We heard from the doctor that, in fact, [Ocampo] was at the hospital with none other than his girlfriend, right? Where is that girlfriend? [¶] [Defense counsel]: Same objection, your Honor. [¶] The Court: Your objection is shifting the burden? [¶] [Defense counsel]: Yes, your Honor. [¶] The Court: Overruled. [¶] Let's move away from that area. It's not shifting the burden, but it could at some point be perceived as doing that if it comes up in multiple times. Let's stay away from that. [¶] [Prosecutor]: It won't be, your Honor. [¶] The point I'm making, ladies and gentlemen of the jury, is failure to call logical witnesses. If there was indeed this reasonable explanation, it has to be supported by evidence. It's not just as simple as saying, 'Well, I want to come up with these facts, and maybe all of them will believe it.' [¶] When we selected you as jurors, in fact, I asked one of you whether if you heard conflicting evidence you would automatically thinks it's done. I asked you not only to look at the reasonableness of the explanation they're giving, but I asked you to look for any supporting evidence for the two different versions that you've heard."

Ocampo argues the comments about the absence of witnesses misstated the law as to the burden of proof, suggesting he had the burden to call witnesses and introduce evidence. He contends he was denied a fair trial and his due process rights were violated. He asserts the conduct was prejudicial "under the harmless-beyond-a-reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128.) We disagree.

Initially, we conclude Ocampo preserved his claim for appeal. He objected twice during the argument; both objections were overruled. He did not object to the final portion, where the prosecution noted it was not shifting the burden of proof but arguing a failure to call logical witnesses. This may not have been an objectionable statement. But Ocampo's assertion it would have been futile to object has some validity because the court overruled his two prior objections. Regardless, on the merits Ocampo's claim fails.

"[I]t has long been established that a prosecutor may comment on the absence of logical witnesses to rebut the People's or corroborate defendant's case. [Citations.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 210.) A review of the prosecutor's statements reveals that is all she did. She did not make any statement to the effect Ocampo was required to supply a witness or evidence to substantiate his explanation about how his burns were caused. Here, there was evidence Ocampo's girlfriend was with him at the hospital when he went for treatment of the burns. She would have been a logical witness to call to substantiate his version of the events.

Moreover, the judge instructed the jury that it was the prosecution's responsibility to prove all the elements of the crime beyond a reasonable doubt. (CALCRIM Nos. 103, 220.) Further, at the end of the closing arguments before the jury left to deliberate, the court, sua sponte, instructed the jury: "I wanted to give you one admonishment regarding defense counsel's earlier objection regarding the shifting of the burden. What he was referring to was a shifting of the burden of proof. You heard about [the] burden of proof and where that goes. And my ruling was I did not believe that was

7

a shifting of the burden, and at the same time I can see where it did very much open the door for possible confusion to you as the jury.  [¶] So all I'm going to say with that is to be sure that you consider the law that I read to you.  Read the law again in the jury instructions.  The law does state, as you were told during voir dire, as you were told during jury instruction, and you guys will have them in the jury room, defendant is not required to prove his innocence or assist the prosecution.  [¶] That's what relates to the issue of shifting the burden.  I don't believe that's what occurred, but I can see where there is a possibility for conclusion [sic].  But you will have the law with you in the jury room."

        This instruction reminded the jury to rely on the reasonable doubt standard set out in CALCRIM Nos. 103 and 220, and thus cured any possible prejudice.  Further, the court instructed the jury with CALCRIM No. 222, which provides that nothing the prosecutor says during argument is evidence, and CALCRIM No. 200, requiring the jury to follow the instructions.  (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.)  We presume the jury understood and followed these jury instructions.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1295.)

        *c. Giraffe Analogy*

        In another portion of the rebuttal, the prosecutor argued:  "Now, defense counsel talked to you about filling in the gaps.  You know what:  We don't have an answer to every potential question that could come up in this case.  We do not.  I invite you to look at the elements and what it is the People have to prove.  Look at the two elements, because that's all we have to prove.  [¶] But we often tell our jurors to look at these particular – imagine yourself having a jigsaw puzzle in front of you.  And you don't know this when you first look at the different pieces that are torn apart, you don't know that, in fact, when you first look at a piece you look at something that looks like a color brown.  And you can't make out what it is when you first look at that piece.  But then you get another piece, and it's a mustard color; right?  And you go, 'Well, they go together,'

8

and you click them together.  [¶] And then you get another piece, and that piece has part of an eye.  So you start making a face.  And then you have a fourth piece that has yellow in it and part of a nose.  And you get piece after piece after piece after piece.  And even though you don't have the entire poster, sooner or later --  [¶] Defense counsel:  I'm going to object.  It's an understatement of reasonable doubt, your Honor, and a misstatement of law.  [¶]  The Court:  Overruled.  [¶] Continue on.  [¶] The Prosecutor: sooner or later you're going to find through the totality of the circumstances that, in fact, you have a giraffe in front of you.  You don't have all the pieces of the puzzle, but sooner or later you're going to be able to tell us from the totality of the circumstances that, in fact, given the example that I just gave you, you have a giraffe in front of you.  I ask you to look at the totality of the circumstances, look at everything that's come in, look for reasonableness, in fact, and look for any supporting evidence to justify any of the conclusions you might reach."

Ocampo claims this was a misstatement of the law as to proof beyond a reasonable doubt, constituting misconduct.  He relies on two cases to support his argument.

In *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, the prosecutor addressed proof beyond a reasonable doubt in closing argument.  After first quoting part of the jury instruction on that issue, she used a PowerPoint presentation to illustrate the concept.  Initially, six pieces of an eight-piece puzzle of the Statue of Liberty appeared.  The prosecutor then argued there was no reasonable doubt what the six pieces showed.

The court of appeal noted the Statue of Liberty was "almost immediately recognizable" and a juror might guess what the pieces depicted even after only one or two were shown.  (*People v. Katzenberger*, *supra*, 178 Cal.App.4th at p. 1267.)  It held use of the puzzle was prosecutorial misconduct because it was a misstatement of beyond a reasonable doubt.  It not only "invite[d] the jury to guess or jump to a conclusion" (*ibid*.), it was an improper quantitative measure of the standard.  (*Id*. at p. 1268.)

9

Similarly, in *People v. Otero* (2012) 210 Cal.App.4th 865, the prosecutor also used a PowerPoint presentation, telling the jury it would illustrate reasonable doubt. The diagram showed, "'No Reasonable Doubt'" at the top. Underneath were outlines of California and Nevada. A dollar sign was shown in south Nevada. "'Ocean'" was printed left of California. "'San Diego'" was printed at the top of the state; below that a star and "'Sac'" were shown. Further below, "'San Francisco'" was shown and "'Los Angeles'" was placed in Southern California. The bottom of the diagram stated: "'Even with incomplete and incorrect information, no reasonable doubt that this is California.'" (*Id*. at p. 869.)

The prosecutor argued, "'I'm thinking of a state'" with a city named San Francisco in its center, Los Angeles in the south, and San Diego in the north. "'Is there any doubt in your mind, ladies and gentlemen, that that state is California? Okay. Yes, there's inaccurate information. I know San Diego is not at the northern part of California, and I know Los Angeles isn't at the southern. Okay. But my point to you in this—'" (*People v. Otero*, *supra*, 210 Cal.App.4th at pp. 869-870.) Defense counsel objected and the trial judge then told the jurors to disregard the diagram because he would be instructing them on reasonable doubt.

*Otero* held use of the diagram was prosecutorial misconduct because it "trivialize[d]" the beyond a reasonable doubt standard. (*People v. Otero*, *supra*, 210 Cal.App.4th at p. 867.) As in *Katzenberger*, the diagram and counsel's argument more than suggested to the jury it could rely on only a few pieces of evidence to jump to the conclusion of guilt. (*Id*. at p. 872.) Despite the presentation's use of eight components, the jurors could come to their conclusion using only one of them; the outline of California made it easily identifiable. (*Id*. at p. 873.) In sum, "[n]ot only [was] the standard of proof reduced to substantially below the condemned percentage in *Katzenberger*, but the jury was informed that reasonable doubt may be reached on such slight proof even when some of the evidence is demonstrably false." (*Ibid*.)

10

Based upon *Katzenberger* and *Otero,* Ocampo asserts the giraffe analogy reduced the burden of proof and suggested the jury use a quantitative scale for considering reasonable doubt. He claims the unique qualities of a giraffe make it immediately recognizable even viewing only a few portions of the image. Citing *People v. Brannon* (1873) 47 Cal. 96, 97, he also claims the argument improperly reduced the reasonable doubt standard to the same level as daily activity, which is more analogous to preponderance of the evidence.

Although there are some surface similarities, the instant case is not comparable to *Katzenberger* and *Otero* for three reasons. First, contrary to both of those cases the prosecutor did not display a picture of a giraffe but only verbally described it. That diminished the impact of the image. Second, there was no argument based on incorrect or false evidence as in *Otero*. Third, the court instructed with CALCRIM Nos. 222 (nothing said by counsel is evidence), 223 (direct and circumstantial evidence), and 224 (sufficiency of the evidence; circumstantial evidence). And, as noted above, we presume the jury followed these instructions. (*People v. Prince, supra,* 40 Cal.4th at p. 1295.)

Most importantly, however, in referring to the giraffe, the prosecutor was not discussing the burden of proof. Review of the argument shows it was in response to Ocampo's claim there was a gap in the prosecution's case. Nor did the argument before or after these comments mention beyond a reasonable doubt. As a result, the prosecutor's statements did not suggest the jury could guess or jump to a conclusion about his guilt without having sufficient evidence to prove he committed the crime. Thus, we conclude use of the giraffe analogy was not error.

Nevertheless, use of this type of device is "unwise," as noted in *People v. Katzenberger*, *supra*, 178 Cal.App.4th at page 1269 and reiterated in *People v. Otero*, *supra*, 210 Cal.App.4th at page 874. The prosecutor's comments wandered close to

11

forbidden territory and, as in *Otero* and *Katzenberger*, we discourage this kind of analogy in argument.

## 2. *Admission of Opinion Evidence Ocampo May Have Stolen Property*

During Valdez's direct testimony, the following was elicited: "Q. Now let me talk to you about why you decided to call [Ocampo] to help you get rid of this car. Why him? [¶] A. I remembered he always asked if I knew anybody who would want stereo speakers, sound systems, things of that nature. [¶] Q. Did you ever get to see any of those stereo systems or sound systems that he was offering? [¶] A. Yes. [¶] Q. And were they packaged? [¶] A. No. [¶] Q. How were they? Describe those for me. [¶] A. Used, previously installed, taken out of previous vehicles and just left in the trunk. [¶] Q. Did this draw any suspicion on your part regarding these stereos that were not boxed, or sound systems? [¶] A. Yes. [¶] [Defense counsel:] Calls for speculation and foundation. [¶] [The court:] Overruled. [¶] [The witness:] Yes. "BY [The prosecutor:] [¶] Q. What was that suspicion? [¶] A. That they would be stolen. [¶] Q. Did you ever buy any of those items from [Ocampo] sitting here? [¶] A. No. [¶] Q. So is that why you decided to call him? [¶] A. I figured he has a small record of know how to take things. [¶] Q. And, in fact, you called him then? [¶] A. Yes. [¶] Q. And did he agree to go ahead and get rid of the car? [¶] A. Yes."

Except for the objection noted above, Ocampo's counsel did not object to any of the questions nor did he seek a limiting instruction.

Ocampo maintains the court should have excluded the testimony under Evidence Code sections 352, 403 and 1101. He argues trial counsel's failure to object on those grounds and request limiting instructions constituted ineffective assistance of counsel.

The Attorney General agrees the evidence was irrelevant and was not admissible but maintains its admission was harmless beyond a reasonable doubt, and thus there was no ineffective assistance of counsel. The Attorney General further contends

12

Ocampo's trial counsel negated any potential prejudice during his closing argument by effectively discrediting Valdez's testimony and credibility. We agree.

The standard for determining ineffective assistance of counsel is well settled. To prevail, a defendant must show that, viewing it objectively, counsel's performance fell below prevailing professional standards and was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) To prove prejudice, a defendant must demonstrate there is a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "'"'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" [Citation.]' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

"'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.]" (*People v. Cox* (1991) 53 Cal.3d 618, 656, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945 ["'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed'"].)

Without deciding whether the Attorney General's concession of inadmissibility is correct, we conclude Ocampo has not shown the requisite prejudice.

Ocampo, of course, disagrees, arguing there was a reasonable probability of a more favorable outcome. He points out the evidence was largely circumstantial. He emphasizes there is no testimony from a percipient witness to show Ocampo or any "co-culprits" were present at the fire, much less burned by it or that they helped to burn the car. Instead, the prosecution had to rely on the inference Ocampo was present due to his burns plus Valdez's testimony Ocampo agreed to dispose of car Valdez was the only witness to testify to Ocampo's involvement. And because the defense was primarily the

13

insufficiency of the prosecution's case, the stolen stereo evidence tipped the scales in favor of conviction and was prejudicial. Finally, he observes, the jurors deliberated for two days after only three days of trial, and requested a read back of testimony of both John Choo, who was the prosecution's investigator, and Valdez.

But those facts do not overcome the evidence that supports Ocampo's conviction, if not as a direct perpetrator, certainly as an aider and abettor. For Ocampo to have been found guilty of aiding and abetting, the prosecution only had to prove the direct perpetrator committed the arson, Ocampo knew the perpetrator intended to do so, at some time Ocampo intended to aid and abet commission of the crime, and Ocampo's conduct or words did so aid and abet the perpetrator. (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1265-1266.) The jury was instructed to this effect.

There was ample evidence as to the planning of the arson and Ocampo's agreement to participate. Ocampo agreed to help get rid of the car at Valdez's request. Evidence of the accelerant in the passenger compartment and the rag presumably used as a fuse supported expert opinion the flash fire was intentionally set.

A flash fire causes first or second degree burns to anyone in its near vicinity. Ocampo arrived at the hospital with second degree burns on his face. He explained to the treating physician he had suffered them approximately 20 minutes before. The car was about 15 minutes' drive from the hospital Ocampo visited. The time Ocampo visited the hospital was within 30 minutes of when the fire crew arrived to deal with the vehicle fire.

Ocampo's explanation of the cause of the fire, from cooking oil in a frying pan, did not match up with the pattern of burns on his face. Moreover, he gave inconsistent explanations of the cause of his burns to the doctor and to his own brother.

The evidence establishes Ocampo was in the near vicinity of the fire. And there were two women near the car who could see it burning, who subsequently left without speaking to the investigators. There were also two cars that drove away once the

14

fire was out. It would have been unusual for any of them to be there in an industrial area at 1:30 in the morning. Although it is unclear which of them actually set the fire, it was reasonable for the jury to infer one of them did. It was also reasonable for the jury to infer Ocampo was present at the crime scene and involved in the arson in some manner and that he meant to do and did do something to contribute to the crime.

Ocampo's argument assumes the jury paid an inordinate amount of attention to the testimony about the stereo equipment. In the context of the other evidence, the testimony about the stereo equipment is brief and insubstantial. The evidence regarding the burn to Ocampo's face is much more damning.

In our review we "'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'This standard applies whether direct or circumstantial evidence is involved.' [ Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) Circumstantial evidence and the reasonable inferences drawn therefrom are sufficient to support the judgment. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069.)

In view of all the evidence, there is no reasonable probability the verdict would have been different absent evidence of Valdez's evidence regarding the stereo equipment.

*3. Cumulative Error*

The only possible error we found was admission of Valdez's testimony regarding Ocampo's proclivity to steal stereo equipment. But it was not prejudicial. Ocampo "was entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We conclude his trial was fair.

15

## DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

MOORE, ACTING P. J.

IKOLA, J.