Filed 5/29/15  P. v. Dietz CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RYAN MITCHELL DIETZ,<br><br>        Defendant and Appellant. | A140421<br><br>(Sonoma County<br>Super. Ct. No. SCR604500) |

Jack Romero was fatally shot in downtown Santa Rosa while out with Garika Rush, with whom he had been having an affair.  Rush's live-in boyfriend, appellant Ryan Dietz, was sentenced to prison for a term of 50 years to life after a jury convicted him of first degree murder and determined he had personally used and intentionally discharged a firearm causing death.  (Pen. Code, §§ 187, subd. (a), 189, 12022.53, subd. (d).)[1] Appellant contends the judgment must be reversed because (1) the evidence was insufficient to support a conviction of first degree murder under a theory of premeditation and deliberation or lying in wait; (2) the trial court should have allowed the defense to introduce evidence of Romero's gang affiliation and Rush's association with violent individuals; and (3) the prosecutor committed misconduct during closing argument by

---

[1] Appellant was also found to have suffered a prior serious or violent felony conviction within the meaning of the Three Strikes law, but that allegation was stricken by the trial court in the interests of justice and is not an issue on appeal.  (Pen. Code, § 1170.12; *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.)

1

analogizing the burden of proof in a circumstantial evidence case to a pointillist painting and by urging the jury to consider the evidence as a whole.  We affirm.

BACKGROUND

Rush was involved in a long-term tumultuous relationship with appellant, the father of three of her four children.  Appellant owned a silver 2004 Toyota Sienna minivan and Rush owned a Chevy Avalanche truck, and both of them had a key to each vehicle.  In 2009 or early 2010, Romero became their next-door neighbor.  One of Rush's daughters befriended Romero's daughter, and Rush and Romero began a sexual relationship.

Rush told appellant about the affair and they argued about it daily.  On one occasion, Rush broke up an altercation between appellant and Romero outside of their apartment.  On another, appellant screamed at Rush and banged on Romero's door after he caught Rush surreptitiously leaving Romero's apartment at 4:00 in the morning.  In May 2010, Rush moved to appellant's sister's house for six weeks, but continued to see Romero.  Rush and appellant reconciled and they moved to another apartment together, though Rush continued to see Romero.  Several months after the move, Rush decided to end her affair with Romero and focus on her relationship with appellant.  For the next six months or so, Romero texted Rush about once a month but they did not see each other.  Rush told appellant she was no longer seeing Romero, but they continued to argue about him.  Rush's relationship with appellant was "up and down" during that time.

Appellant saw text messages from Romero to Rush on Rush's cell phone, which Rush sometimes left lying around in the apartment.  Appellant was very upset and angry at Rush.  Knowing appellant was checking her messages, Rush began using her oldest daughter's cell phone to communicate with Romero.  In May or June of 2011, Rush got into a heated argument with appellant after appellant saw a missed call or text message from Romero.  Appellant told Rush to stop seeing Romero or she "was going to end up making him [appellant] do something stupid," and said he had dreams about murdering Romero.  Appellant sent Rush a number of text messages during this period, some expressing his love for her, some expressing his anger toward her (in very colorful

2

language), and some expressing frustration (also in very colorful language) that she was not at home and he could not find her.

On June 25, 2011, Rush and appellant returned home from a party at a winery and appellant fell asleep. Rush texted a few friends, including Romero, about going out that night. She sent a text to her friend Wendy Hernandez asking her to be her alibi so she could go out with Romero. Rush picked up Romero in the Toyota Sienna and they went dancing. The next day, Rush saw appellant looking at her phone, but he did not say anything.

On June 28, 2011, Rush and Romero had plans to go to the movies together, but Rush's sister went into labor and Rush drove her to the hospital. Rush returned home to take a shower and gather some things before returning to the hospital, and appellant became angry with her when she refused to let him join her in the shower. When Rush asked appellant to hand her a razor, intending to shave her legs (something she did not do regularly), appellant asked why she needed it. Rush drove the Chevy Avalanche back to the hospital to see her sister while appellant took the children to a family party in the Toyota Sienna. She stayed at the hospital until 9:30 p.m., but falsely told appellant on the phone that she would be there for a few more hours, as this would give her the opportunity to spend time with Romero.

At about 10:00 p.m., Rush picked up Romero at his home and they drove to the Third Street Aleworks, a restaurant in downtown Santa Rosa. On Romero's suggestion, Rush parked around the corner on Second Street and D Street rather than on the street in front of the restaurant. They walked down a pedestrian alley that passed by a parking garage behind the Aleworks to the back door of the restaurant, where they sat at the bar and shared pitchers of beer until midnight when the restaurant closed.

Rush and Romero chatted with a few people outside the front door after they left the restaurant, and at some point Rush turned toward Romero and saw he was gone. As she continued to talk to a couple she had met inside the restaurant, Rush heard a series of loud pops, which she thought were fireworks or firecrackers. Although she did not know

3

it at the time, Romero had been fatally shot in the parking garage near the alleyway they had traversed to get to the Aleworks.

Billy With, Alexandra Prada and Adam Beltz were changing a flat tire on With's car nearby when they heard gunshots. With recalled five or six shots being fired and, after a pause, six or seven more shots. Prada was curious and ran toward the shots, where she saw a man leaving the parking garage and walk to a silver minivan. With followed Prada and also saw the man get into a silver minivan. Beltz saw the man holster a weapon and get into what he later described to police as a silver Honda Odyssey minivan. Prada and With saw someone lying on the ground in the parking garage and Prada called 911.

Rush assumed Romero had gone back to her truck or had gone around the corner to urinate.[2] The couple she was speaking with accompanied her through the pedestrian alley toward the place she had parked. The man directed Rush's attention to a body on the ground, and they walked back to the Aleworks and asked the restaurant staff to call the police. Rush tried to call Romero on her phone but he did not answer.

Officers from the Santa Rosa Police Department arrived at the scene and one of them approached Rush. She said she was looking for her friend and described Romero. The officer led her to an area near the alley marked with yellow tape and shined a flashlight on a body from a distance of about 25 feet. Rush recognized the body as Romero but did not tell the officer because she was in shock. She was questioned by police officers but was not cooperative and did not want to be involved.

The police released Rush and she returned home at about 8:00 a.m. Appellant was not there, but Rush had a number of missed calls and texts from him from the previous night. When she called appellant, he was angry that he had to leave for his job at an electrical company without his tools, which were in the Avalanche. Appellant tried to call Rush a number of times that morning, but she did not answer her phone and did not

---

[2] Romero's bladder contained about a cup of urine at the time of his death, an amount that could have caused him to feel the need to urinate.

speak to him again until 11:00 a.m., when he called her daughter's cell phone and asked to speak with Rush. Appellant was nicer than he had been the last time they spoke and asked Rush to do him a favor. He instructed her to go into the garage and find a large box with two shoe boxes inside, and to retrieve a bag with a box inside from the driver's side wheel well compartment of the Avalanche. She was to take the boxes and dispose of them in different trash Dumpsters. When Rush asked appellant why, he said he would tell her when he got home.

Rush did what appellant asked, noticing that the box inside the bag was white with a "W" logo. She threw this box into a Dumpster in the back of one shopping center, and then drove to a second shopping center where she discarded the two shoe boxes in two different Dumpsters. Before doing so, she opened the boxes and saw nails, metal trinkets and bullets inside one of them. The other shoe box contained a number of small black boxes inside, but Rush did not open them. After disposing of the boxes, Rush went to the hospital to visit her sister and returned home, where she looked under her bed and saw that the two or three rifles appellant usually kept there were missing.

Police officers had been surveilling Rush and had retrieved the trash bag she placed inside the Dumpster at the first shopping center. It contained a box of Winchester Smith & Wesson .40-caliber ammunition, including 24 live, unfired rounds and 26 empty slots. The officers also retrieved the shoe boxes placed in the Dumpsters at the other shopping center, one of which contained several boxes of Wolf .223-caliber ammunition, bullets typically used in high-powered weapons like an M16 rifle. Police officers arrested Rush at her home and, having made the connection between appellant and Rush, arrested appellant at his place of employment. During a search of their home, police found a gun cleaning kit, ammunition for a shotgun and ammunition for a rifle.

Billy With later identified appellant in a photo lineup as the man he had seen walking to the van after he heard the shots fired on the night of the killing, but he did not identify appellant in a live lineup. Alexandra Prada did not initially identify appellant in a photo lineup, but contacted a district attorney investigator shortly before the trial in the case and identified appellant in a live lineup as the man in the minivan. She explained

5

she did not identify him at first because she was afraid, but had decided to do the right thing after her grandparents died.

Rush's and appellant's cell phones were examined by a digital forensics expert who extracted information from the phones and determined that Google Latitude, a location-sharing application, had been installed on both of them. Latitude allows users who are linked (such as appellant and Rush) to track the location of each other's phone. The application was installed on appellant's phone on May 6, 2011, and on Rush's phone on June 16, 2011. On the night of the shooting, Rush's phone transmitted that it was in the vicinity of Third Street and D Street in Santa Rosa. The Latitude files on appellant's phone, which would have allowed him to track Rush's whereabouts the previous night, had been deleted on the morning after the shooting.

Security videos taken on the night of the shooting were retrieved from a bank and government building in downtown Santa Rosa. The videos showed a minivan turning on D Street near the scene of the shooting at about 11:25 p.m. A detective who later drove appellant's Toyota minivan past the same cameras during a nighttime reenactment compared the videos and still photos from the night of the shooting with the videos and still photos from the night of the reenactment and concluded the van captured on the night of the shooting looked the same as appellant's van.

The forensic evidence at the scene included 11 casings fired from a single semiautomatic weapon. The distribution of spent cartridges suggested the shooter was moving while firing the shots. Cartridge cases from the crime scene were compared to the ammunition recovered from the Dumpsters, and one box of ammunition was found to have been made by Smith & Wesson, the same manufacturer as the spent cartridges. A ballistics expert examined the "bunter marks" on the cartridges of the casings recovered from the scene (the marks created by a bullet manufacturing tool that produces the head stamp on cartridge cases). The bunter marks on some of the cartridges recovered from the scene were similar to those on the ammunition in the box found in the Dumpster, suggesting they had been manufactured and stamped by the same tool.

The coroner who examined Romero's body found a total of eleven gunshot wounds:  two in his head, eight in his torso, and one in his upper arm.  One of the bullets, which had lodged in Romero's neck, was fired from a distance of one to three feet away.  Seven of the shots had entered the back side of Romero's body, with exit wounds on the front side.  A wound in Romero's buttock was at a sharply downward angle, suggesting the shooter was positioned above Romero when it was fired.

Later, Rush pleaded no contest to being an accessory after the fact with an agreement she would receive probation if she gave truthful testimony against appellant at his trial.  (Pen. Code, § 32.)

DISCUSSION

A.  Sufficiency of the Evidence of First Degree Murder

The jury was instructed on two theories of first degree murder:  (1) willful, deliberate and premeditated murder; and (2) murder by lying in wait.  (Pen. Code, § 189.) Appellant contends the evidence was insufficient to support a conviction under either theory.  He also argues that the lack of evidence of lying in wait renders the instructions under that theory prejudicial, even if the evidence is deemed sufficient to support a finding of premeditation and deliberation.  We disagree.

"In assessing the sufficiency of the evidence supporting a jury's finding of premeditated and deliberate murder, a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment. [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069 (*Mendoza*.)

" ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.]  'Deliberation' refers to careful weighing of

7

considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" ' " (*Mendoza*, *supra*, 52 Cal.4th at p. 1069.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) " ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*Mendoza*, at p. 1069.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the state Supreme Court identified three categories of evidence relevant to the presence of premeditation and deliberation: (1) planning activity, (2) motive, and (3) the manner of the killing. (*Mendoza*, *supra*, 52 Cal.4th at p. 1069.) Though these so-called *Anderson* factors are not exhaustive or exclusive of other considerations (*ibid*.), their application to the present case supports a finding the murder was premeditated.

With respect to planning, the evidence showed appellant and Rush had argued repeatedly about her relationship with Romero and during one such argument, appellant told her to stop seeing Romero or she "was going to end up making him do something stupid." Appellant had also told Rush he had dreams about murdering Romero. The jury could reasonably conclude that on the night of the shooting, appellant tracked Rush's whereabouts using the Google Latitude application installed on both their phones. Given the ongoing nature of Rush's relationship with Romero, appellant would have at least suspected he would find them together, and came to the scene prepared with a loaded semiautomatic pistol. The surveillance video footage from a nearby bank and government building support the inference that appellant had driven his van to the area at least 30 minutes before the shooting, giving him time to deliberate and reflect before confronting Romero. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [defendant's act of arming himself and following victim was evidence of planning]; *People v. Miller* (1990) 50 Cal.3d 954, 993 [taking weapon to scene was indication of planning]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 757 [prior threats were proof of planning].)

The evidence of motive, the second *Anderson* factor, was equally strong. Romero was having an ongoing sexual relationship with Rush, appellant's live-in girlfriend and the mother of his children. Appellant and Rush frequently argued about this situation, and it upset appellant to the point he had thoughts of killing Romero. (*Anderson*, *supra*, 70 Cal.2d at p. 29; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1117 [recognizing sexual jealousy as a motive supporting finding of premeditation and deliberation]; *People v. Martinez* (1987) 193 Cal.App.3d 364, 372 [evidence the defendant was motivated by jealousy at time of killing supported finding of premeditation].)

Finally, the manner of the killing supports a determination appellant acted with premeditation and deliberation. Appellant shot Romero eleven times, at least six times in the back. A gunshot wound to the neck was fired at close range (one to three feet away) and the angle of one wound suggested appellant was standing over Romero when that shot was fired. Billy With, a witness unrelated to either appellant or the victim, heard a series of gunshots, a pause, and then several more shots, suggesting appellant had an opportunity to reflect even as the shooting was in progress. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 768 [shot to victim's face "entirely consistent with a preconceived design to take his victim's life"]; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [manner of killing—firing five or six shots at close range—supported inference "the shooter was intent on inflicting death"].)

Because we conclude the evidence was sufficient to support a conviction of first degree premeditated murder, any error in giving instructions on a lying-in-wait theory would be harmless "absent an affirmative indication in the record that the verdict actually did rest" on the lying-in-wait theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [where case given to jury on different factual theories, one of which is not supported by the evidence, court presumes the jurors rejected that theory and based the verdict on the factually supported theory].) The record does not affirmatively indicate the jury relied on lying in wait as a basis for first degree murder, and appellant is not entitled to reversal even if we assume the evidence did not support a lying-in-wait theory as he alleges.

9

In any event, the evidence presented *was* sufficient to support a conviction under a lying-in-wait theory. "Lying-in-wait murder consists of three elements: ' " '(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.]" ' " (*People v. Russell* (2010) 50 Cal.4th 1228, 1244, fn. omitted.) Lying in wait is " ' "the functional equivalent of proof of premeditation, deliberation and intent to kill." ' " (*Id.* at p. 1257.) "The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse." (*People v. Stevens* (2007) 41 Cal.4th 182, 202.)

Substantial evidence supports the conclusion appellant concealed his purpose from Romero by driving to a location where he would likely find Romero, armed with a loaded handgun, and parking his van and waiting without making his presence known. The evidence also showed appellant engaged in a substantial period of watching and waiting, having arrived at the scene approximately 30 minutes before the shooting. (See *People v. Moon* (2005) 37 Cal.4th 1, 23 [90 seconds of waiting sufficient to show the defendant lay in wait].) A surprise attack from a position of advantage can be readily inferred from the evidence presented.

B. Exclusion of the Evidence Regarding Romero's Gang Ties and Rush's Association with Dangerous Individuals

Appellant argues the trial court violated his due process right to present a defense when it excluded evidence he claims would have tended to show he did not act with premeditation and deliberation. We disagree.

This issue arises from a defense request to admit evidence Romero was associated with a gang and routinely carried a gun, on the ground such evidence was relevant to theories of self-defense and third party culpability. The defense also sought to admit evidence of a 2006 incident in which appellant's best friend, John Purkey, had confronted Rush while she was in the company of two other men and told her he was going to tell

10

appellant, prompting the men who were with Rush to stab Purkey in his leg and thumb. Defense counsel argued evidence of this incident tended to show appellant knew Rush kept company with violent people, and suggested he was carrying a gun for self-protection when he went looking for her on the night of the shooting.

The court ruled the gang evidence was inadmissible under Evidence Code section 352, because it was highly prejudicial and not particularly probative considering that Romero's purported gang ties were in 2007 or 2008, three years before the shooting in this case. The court excluded evidence of the 2006 Purkey incident on the same basis, noting it was irrelevant to the issues in this case, did not involve Romero, and was remote in time. The court indicated Rush would be allowed to testify that she had seen Romero with a gun.

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) "Relevant evidence" is statutorily defined as evidence "having any tendency in reason to prove or disprove a disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Under Evidence Code section 352, relevant evidence may be excluded when "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's ruling regarding relevance and admissibility under Evidence Code section 352 for abuse of discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Under this deferential standard, we will not reverse "unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*Ibid.*)

The trial court did not abuse its discretion in excluding evidence Romero had associated with a gang several years prior to the shooting. Romero's possible gang affiliation was not relevant to show appellant was carrying the gun to protect himself when there was no admissible evidence appellant was aware of this affiliation. (See *People v. Cash* (2002) 28 Cal.4th 703, 726-727 [victim's debt collection practices not relevant to show defendant's state of mind unless defendant knew of those practices].)

11

And, to the extent the defense wanted to use the gang evidence to show Romero might have been murdered by a rival gang member, there was no showing of third party culpability sufficient to render the evidence admissible. The law "does ' "not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." [Citation.]' " (*People v. Panah* (2005) 35 Cal.4th 395, 481.)

Nor did the trial court abuse its discretion when it excluded evidence of the Purkey incident in 2006. Though appellant argues this evidence would have shown he believed that anyone who was with Rush was likely to be armed and dangerous, and thus explained his possession of a gun on the night of the shooting, it does not suggest he acted in self-defense with respect to Romero, who had nothing to do with the prior incident.

Even if we were to assume the court should have allowed the evidence described above, its exclusion does not require reversal. In general, the application of the ordinary rules of state evidence do not infringe upon a defendant's federal constitutional right to present a defense and will be reviewed under the standard for state law error announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks whether it is reasonably probable the jury would have reached a result more favorable to the defense if it had heard the excluded evidence. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) The proffered evidence of Romero's gang ties and the Purkey incident were only minimally probative and, while they arguably supplied a reason for appellant's decision to arm himself when he went to look for Rush (and Romero), they do not explain why appellant decided to use that gun to shoot Romero 11 times and do not supply a reasonable basis for concluding someone other than appellant was the shooter.

Moreover, the jury did not have an unrealistic impression of Romero as a completely peaceful and law-abiding individual. Defense counsel elicited testimony

12

from Rush that Romero had been involved in illegal drug activity, that he kept a handgun under his pillow, and that he often carried a gun with him when they went out. Police officers testified that a loaded .45-caliber semiautomatic handgun was discovered under Romero's pillow in a search of his home the evening after the shooting. This gun and another Glock handgun were registered to Romero. It is not reasonably probable that additional evidence about Romero's prior gang ties or the Purkey incident would have changed the result of the trial.

C. Prosecutorial Misconduct

Appellant contends the prosecutor committed misconduct during closing argument by comparing the burden of proof in a case dependent on circumstantial evidence to a pointillist painting and pieces of a puzzle. He claims the argument was misleading because it understated the burden of proof beyond a reasonable doubt. We disagree.

1. *Closing Argument and Instructions on Reasonable Doubt*

During the prosecutor's rebuttal argument, he projected slides from a pointillist painting by the artist Georges Seurat and made the following comments over defense objection: "Post-impressionist painter, George[s] Seurat, painted with a type of art called pointillism. And he would take varying colors and place dots on his paintings, to draw a picture. And there comes a point as in Seurat's paintings that you have to get up from your chair and stand back and take a look at the big picture. The totality of the circumstances in this case. There's a lot of evidence in this case. There are a lot of pieces to the puzzle. And sometimes you have to stand back to get a good view to consider it all. And that's what Seurat did. That's what you have to do. [¶] Common sense, ladies and gentlemen. If it doesn't sound right, in the general scheme of things, considering the totality of the circumstances, if it doesn't fit, that puzzle piece doesn't fit, if it doesn't make sense to you, if it's not, if it doesn't sound reasonable to you, then it's not reasonable. But if it sounds appropriate, if the pieces of the puzzle fit, if it makes sense, it is reasonable. To adopt the position that [appellant] did not kill Jack Romero

13

would be unreasonable, given the fact that all the evidence points to [appellant]. Every bit of it."

The jury was instructed with CALCRIM No. 220, regarding the presumption of innocence and the standard of proof beyond a reasonable doubt, which provided in relevant part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The court also instructed the jury with CALCRIM No. 223, defining direct and circumstantial evidence, and CALCRIM No. 224, regarding the sufficiency of circumstantial evidence in general: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." The court also gave CALCRIM No. 225, which echoed CALCRIM No. 224 with respect to circumstantial evidence of intent and mental state.

14

In a motion for new trial, appellant argued the quoted portion of the prosecutor's rebuttal argument and its reference to the pointillist painting was misconduct because "[e]quating reasonable doubt to a bunch of dots created by an artist or puzzle pieces is preposterous" and lowers the burden of proof beyond a reasonable doubt. The court denied the motion, concluding the prosecutor's argument did not amount to misconduct or alter the burden of proof.

### 2. *Prosecutorial Misconduct—General Principles*

" ' "The standards governing review of [prosecutorial] misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.]" ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427.)[3]

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).) When a prosecutor's remarks to the jury are at issue, the defendant must demonstrate " '[i]n the context of the whole argument and the instructions' [citation], there was a 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that

---

[3] "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*Id.* at p. 667.)

3. *Analysis*

Appellant likens the prosecutor's reference to the pointillist painting to arguments made by the prosecutors in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1264-1269 (*Katzenberger*) and *People v. Otero* (2012) 210 Cal.App.4th 865, 869-874 (*Otero*), which used a puzzle analogy and diagram/map analogy, respectively, to illustrate the concept of reasonable doubt. We are not persuaded.

In *Katzenberger*, the prosecutor's closing argument included a PowerPoint presentation in which six of eight puzzle pieces created a picture immediately and easily recognizable as the Statue of Liberty, although a portion of the statue's face and torch were not visible. (*Katzenberger*, *supra*, 178 Cal.App.4th at pp. 1264-1265.) Over defense objection, the prosecutor argued that even without the missing pieces, a person would know beyond a reasonable doubt the puzzle depicted the Statue of Liberty. (*Ibid.*) The appellate court concluded the PowerPoint presentation was misleading because it left the "distinct impression that the reasonable doubt standard may be met by a few pieces of evidence" and "invite[d] the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Id.* at p. 1267.) The presentation had also suggested, erroneously, that proof beyond a reasonable doubt could be measured quantitatively at 75 percent (six of eight puzzle pieces). (*Id.* at pp. 1267-1268.) Though the prosecutor's actions were harmless in light of the overwhelming evidence of the defendant's guilt and the jury instructions correctly defining reasonable doubt, the presentation did amount to misconduct. (*Id.* at pp. 1268-1269, applying standard of prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

In *Otero*, the court disapproved the prosecutor's use of a diagram depicting the outlines of California and Nevada that showed ocean to the left of California and a dollar sign in southern Nevada, but contained inaccuracies such as showing a city called "San

16

Diego" in the northern part of California. (*Otero*, *supra*, 210 Cal.App.4th at p. 869.) At the bottom of the diagram was the statement, " 'Even with incomplete and incorrect information, no reasonable doubt that this is California.' " (*Ibid*.) The point being made by the diagram and the accompanying statement—that even with inaccurate information it was possible to say beyond a reasonable doubt the state depicted was California—was reiterated by the prosecutor during closing argument before the trial court sustained a defense objection and told jurors to disregard the diagram and rely solely on the definition of reasonable doubt provided in the instructions. (*Id*. at p. 870.) The appellate court found the argument improper (though harmless under the *Chapman* standard) because it urged jurors to " 'jump to a conclusion, a process *completely at odds* with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt.' " (*Id*. at pp. 872, 873.)

The reasoning of *Katzenberger* and *Otero* was approved by the state Supreme Court in *Centeno*, in which the court found the prosecutor's use of a diagram similar to the one in *Otero* to be reversible error. (*Centeno*, *supra*, 60 Cal.4th at pp. 665-666, 669-670.) "The use of an iconic image like the shape of California or the Statute of Liberty, unrelated to the facts of this case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial. They are immediately recognizable and irrefutable. Additionally, such demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Id*. at p. 669.)

Another problem noted by the court in *Centeno* was the prosecutor's erroneous suggestion the People could meet their burden of proof if their theory of the case was merely "reasonable." (*Centeno*, *supra*, 60 Cal.4th at p. 672.) "[T]he prosecutor's argument began with what the jury could consider: reasonably possible interpretations to be drawn from the evidence. While this is an acceptable explanation of the jury's starting point, it is only the beginning. Setting aside the incredible and unreasonable, the jury evaluates the evidence it deems worthy of consideration. It determines just what that

17

evidence establishes and how much confidence it has in that determination. The standard of proof is a measure of the jury's level of confidence. It is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt. [Citation.]" (*Ibid*.)

The prosecutor's pointillist painting analogy in this case does not suffer from the same flaws as the puzzle and diagram analogies in *Katzenberger*, *Otero* and *Centeno*. The prosecutor did not suggest the standard of proof beyond a reasonable doubt could be met if portions of the evidence were missing, nor did he place any quantitative measure on proof beyond a reasonable doubt. (Cf. *Katzenberger*, *supra*, 178 Cal.App.4th at pp. 1267-1268.) He did not invite the jurors to jump to a conclusion based on their own knowledge of facts outside the evidence, but urged them instead to do the opposite: to stand back and review all of the evidence presented. (Cf. *Otero*, *supra*, 210 Cal.App.4th at p. 870; *Centeno*, *supra*, 60 Cal.4th at p. 669.) And nothing in the prosecutor's remarks can be construed to equate "beyond a reasonable doubt" with a merely "reasonable" view of the evidence presented, without regard to the jury's level of confidence in its conclusion. (Cf. *Centeno*, at p. 672.)

The court gave CALCRIM No. 220, which fully and correctly defined the standard of proof beyond a reasonable doubt. (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1119.) The pointillist painting analogy did not understate the People's burden, and there is no reasonable likelihood the jury applied the challenged portion of the prosecutor's argument in an improper or erroneous manner. (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

Appellant argues that by asking the jury to "stand back and take a look at the big picture," and by urging it to base its verdict on "[t]he totality of the circumstances in this case," the prosecutor invited jurors to disregard the rule that in a case based on circumstantial evidence, each essential "link" in the chain of evidence necessary to establish guilt must itself be established beyond a reasonable doubt. (*People v. Meyes* (1961) 198 Cal.App.2d 484, 497, fn. 4; see *People v. Tripp* (2007) 151 Cal.App.4th 951, 956; *People v. Redrick* (1961) 55 Cal.2d 282, 290 [strength of "links" in circumstantial evidence case is for trier of fact, but reversal is required when a necessary link is

missing].)  We do not agree.  Asking the jury to view the evidence as a whole does not suggest they could return a verdict without finding all of the "links" necessary to convict.  The jury was properly instructed with CALCRIM No. 224, which stated, "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, *you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt*."  This instruction accurately stated the law and we presume the jury followed it when evaluating the evidence.  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166 [CALCRIM No. 224 correct statement of the law]; *People v. Hovarter* (2008) 44 Cal.4th 983, 1005; *People v. Boyette* (2002) 29 Cal.4th 381, 453 [on appeal, courts presume jury followed instructions given].)

## DISPOSITION

The judgment is affirmed.

19

_____
NEEDHAM, J.

We concur.

_____
JONES, P. J.

_____
SIMONS, J.

(A140421)