Filed 1/7/25  P. v. Davis CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY DAVIS,<br><br>     Defendant and Appellant. | No. B328904<br><br>(Los Angeles County<br>Super. Ct. No. KA126733)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>     **[No change in judgment]** |

THE COURT:

Order modifying opinion; no change in judgment.

It is ordered that the opinion filed on December 18, 2024 be modified as follows:

On page 16, the sentence, "He also attempted to clean up the blood as demonstrated by a towel with blood on it" is deleted from the final paragraph.  The final sentence of the paragraph is amended to read, "The jury could have reasonably considered this

effort to conceal the activity to infer deliberation.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1128.).”

This modification does not affect the judgment.  In all other respects, the People and Davis's petitions for rehearing are denied.

EDMON, P. J.                    ADAMS, J.            HANASONO, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/18/24  P. v. Davis CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B328904 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA126733) |
| v. | |
| ANTHONY DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Lori Nakaoka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

# INTRODUCTION

Defendant and appellant Anthony Davis appeals his conviction for first degree murder, arising out of a 1978 cold case. He raises claims of: (1) insufficiency of evidence to support deliberate and premeditated murder, (2) improper exclusion of hearsay statements, (3) improper admission of defense counsel's comments during a pre-arrest interview, (4) prosecutorial misconduct based on multiple comments made before the jury during the trial, and (5) cumulative error. Davis also challenges the trial court's denial of a motion to dismiss for failure to preserve evidence and denial of presentence conduct credits. We agree that the prosecutor improperly commented on Davis's exercise of his Fourth Amendment right when he refused to voluntarily submit a DNA sample and fingerprints. But the error was harmless beyond a reasonable doubt. We reject all other claims and affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

#### 1. *The Prosecution Evidence*

##### a. The incident and original investigation

On January 7, 1978, at about 3:00 p.m., El Monte Police Department Officer Craig Sperry went to the Spic and Span Motel in El Monte, California. When Officer Sperry arrived at Room 2, the door was ajar. Officer Sperry pushed the door open and saw blood on the bed, on the north, west, and south walls, and on the door on the east wall. He found the decedent Rudolfo Chavez unclothed on the floor.

The motel night manager, An-Chu Shaw, provided a registration card for Room 2 to Officer Sperry. The registration card listed an address on Davis Avenue in Maryland. It was later

2

determined this address did not exist. It was also later determined that Chavez had a safe deposit box in Maryland.

Shaw provided Officer Sperry with a description of the two persons who checked into Room 2. The description was "entirely different" from Davis's description at trial. Shaw worked behind a window. The two men checked in at night and the room was not well-lit. In his 1978 report, Officer Sperry described Shaw as an "Oriental female," but clarified in his testimony that she was Asian.

Los Angeles County Sheriff's Department supervising criminalist Gary Chasteen collected evidence from Room 2. These included blood samples and a bedspread that was placed over the window. Chasteen also collected latent fingerprints.

On January 8, 1978, at about 2:05 p.m., Officer W.A. Mitchell of the Arizona Department of Public Safety saw a stopped car on the southbound frontage road while driving on the Interstate 17.[1] He found the passenger door ajar. He did not find car keys. The car contained documents with Chavez's name, a bloodstained envelope, and a hitchhiker sign with "Phoenix" written on it. The car was towed to an impound lot.

On January 10, 1978, Los Angeles County Sheriff's Department Crime Lab Criminalist Wayne Plumtree and two officers from the El Monte Police Department went to Arizona to collect evidence from the car. The car's ignition had no damage. No car keys were found. Chavez's wallet was found on the front floorboard.

---

[1] The parties stipulated to the facts related to the discovery of Chavez's car.

3

Plumtree collected blood samples from the car and items found inside of it. An envelope from General Telephone and a return card from International Society of Postmasters were inconclusive for ABO blood types but were positive for blood enzymes. An envelope from American Savings and Loan was inconclusive.

Chief Los Angeles County Coroner Lakshmanan Sathyavagiswaran conducted an autopsy on Chavez in 1978. Chavez was five feet, four inches tall, weighed 156 pounds, appeared to be in his early forties with a moderate build. He sustained 45 stab wounds. These wounds included 15 to the head and neck, 10 to the torso, and 14 to the back of the torso. Lakshmanan determined the cause of death to be hemorrhage from multiple stab wounds. Most of the wounds appeared to be inflicted by an instrument with one dull side and one sharp side with some having two sharp sides. Lakshmanan could not identify the kind of weapon used. He examined Chavez's clothing and saw no stab marks on them.

Lakshmanan saw no injuries indicating sexual assault. But he could not rule out consensual sex.

### b. Reopening of investigation in 2018

In 2018, Los Angeles County Sheriff's Department Forensic Identification Specialist Angela Lopez conducted a print analysis after the Automated Fingerprint Identification System made an identification. Lopez obtained the crime scene photographs and vehicle latent prints from the evidence storage and compared them to the 10-print exemplar cards for Davis and Timothy Heisley.

On February 28, 2018, Lopez conducted three comparisons. First, she identified the latent print taken from the inside left

4

edge of the motel room door as Davis's left thumb print. Second, Lopez found no match when comparing the latent prints from Chavez's car and Davis's exemplar. Third, she matched Heisley's exemplar to the print found on the steering column of Chavez's car, one inch in front of the turn signal.

For two prints on the inside passenger window, Lopez excluded Heisley. Lopez did not attempt to compare these prints to any other print exemplars.

Los Angeles County Sheriff's Department Homicide Bureau, Cold Case Unsolved Unit Detective Dale Falicon confirmed Lopez's analysis. Prior to his current assignment, for 19 years, Falicon examined latent fingerprints for the Sheriff's Department. Falicon identified Davis's left thumb print and palm print on the interior motel room door, 20 inches from the top of the door with the thumb pointed downward lower than the palm. Falicon did not see any blood in the prints.

On February 28, 2018, Los Angeles County Sheriff's Detective Harry Lewin was assigned to the case after receiving information about the fingerprint originally found at the Spic and Span Motel. He learned Davis's thumb print and palm print were on the inside of the front door to Room 2.

Detective Lewin tried calling Davis, but no one answered. He left a business card and note to call him in Davis's mailbox. Davis called four days later. Lewin advised him that they needed to talk in person. Forty minutes later, a lawyer called and Detective Lewin informed him that Davis's prints had been found in a crime scene. Davis called again and insisted that his prints had been planted. But he agreed to meet Detective Lewin.

On November 19, 2018, Detective Lewin interviewed Davis at a restaurant. Davis denied being around El Monte in 1978.

But he admitted that he lived in El Monte as a child. He then moved to Temple City. Davis said in 1978 he lived in Sherman Oaks. Davis denied ever going to the Spic and Span Motel. He also denied knowing anyone named Rudy Chavez.

Detective Lewin asked Davis if he ever spent time with gay persons. Davis responded, "No, absolutely not." He also stated, "I'm not uh, part of that clan," and "I'm totally a heterosexual male, even though I'm not married."

After the interview, Detective Lewin asked Davis if he would provide a DNA sample and fingerprints. Davis refused. Detective Lewin later obtained a search warrant for both.

In 2019, Detective Lewin interviewed a man named Timothy Heisley in Florida. His fingerprints were found on the steering column of Chavez's car. Heisley provided a DNA sample to the police in Florida and it was sent to Detective Lewin.

**2.** *DNA Evidence*

Los Angeles County Sheriff's Department senior criminalist Jamie Lajoie tested multiple blood samples found in the motel room for DNA. She analyzed nearly one hundred DNA samples for this investigation.

Lajoie expressed her certainty of the findings in DNA analysis in terms of likelihood ratios which describe the statistical evidence for inclusion. According to Lajoie, anything over one million indicated a very strong likelihood of inclusion. Anything between 100 to 10,000 indicated a moderate likelihood of inclusion. Anything between 2 to 99 indicated a limited likelihood.

Chavez's DNA was included in the blood samples. Lajoie testified that the likelihood ratio that Chavez was included as the source of blood was "two times ten to the ninth times" more likely

that it originated from him and an unknown individual than if it had originated from him and two unknown individuals. This indicated a very strong likelihood of inclusion.

Lajoie testified that the bedspread found in the room had multiple bloodstains. She examined the bedspread for semen using multiple tests, including an alternate light source test, a presumptive test for acid phosphatase (an enzyme found in semen), and a presumptive test for the P-30 protein (found in semen). One area of the bedspread produced positive results for all three tests.

From this area, Lajoie extracted sperm cells and epithelial cells. She stated that DNA from sperm cells and blood tend to withstand the test of time better than DNA deposited by touching a surface. She identified sperm cells in the sample. She determined that Davis was a contributor. The likelihood ratio for the profile was approximately two times ten to the twenty-fifth times more likely if it originated from Davis and an unknown individual than if it had originated from two unknown individuals. This was considered a very strong level of support.

The secondary contributor was a low-level or trace contributor. Lajoie compared the whole mixture to reference samples from Heisley and Chavez. She determined that both were excluded as contributors from the mixture. She had no other information about the second contributor.

According to Lajoie, with old samples, she faces trying to distinguish between a trace contributor of true DNA and "artifacts" due to the amplification process. In other words, these artifacts are a "by-product of the copying process." Lajoie testified that degraded samples can create artifacts that can look like a trace contributor. Here, she could not conclude the absence

7

of artifacts.  Consequently, Lajoie erred on the side of caution and concluded the presence of two contributors with the second contributor as a trace contributor.  According to Lajoie, the sample "could be expressing elevated artifacts or it could be a second person's DNA.  They are both true."

The epithelial fraction from the bedspread sample also contained a mixture.  Lajoie concluded that Davis and Chavez were included in the DNA profile.  A third unknown contributor was also included.  This unknown contributor was listed as a 1 percent contributor.  Lajoie deemed it a low-level trace contributor.

The likelihood ratio for Davis was approximately "four times ten to the fifteenth times" more likely if it had originated from Davis and two unknown individuals than if it had originated from three unknown individuals.  Again, this was considered the highest level of support.  The likelihood ratio for Chavez was approximately "three times ten to the tenth times" more likely if it originated from him and two unknown individuals than if it had originated from three unknown individuals.  This was considered another strong profile.

Lajoie did not identify the source of Chavez's DNA that was included in the epithelial fraction.  It could have come from blood, skin, or hair.

There were other samples on the bedspread that potentially contained bodily fluid other than semen.  Lajoie did not test these samples for DNA.  She was only looking for semen.

Lajoie also determined that Chavez's DNA was on the blood-stained American Credit and Savings envelope found in the car.  Heisley's DNA was found on two cigarette butts.

### a. Interview with Deputy District Attorney Lewin

On February 8, 2021, Deputy District Attorney John Lewin interviewed Davis in the presence of his attorney, James Blatt, who also represented him at trial. Detectives Harry Lewin and Dale Falicon were also present.[2] Early in the interview, DDA Lewin stated that if Davis did not state anything different from the evidence in his possession, he would file a murder case against him.

Davis lived in Arcadia and Temple City, California as a child. He initially denied having a connection to El Monte. Davis later returned to Temple City as an adult in December 1977 to February or March of 1978. Davis confirmed that he was living close to El Monte and the Spic and Span Motel at this time. He denied ever going to the Spic and Span Motel. After that, he moved to the San Fernando Valley.

DDA Lewin next cautioned Davis that he wanted to turn to an area that was a "little bit uncomfortable," but "incredibly important." Lewin asked about Davis's sexual orientation. Davis responded, "I am a total heterosexual male." He denied ever having "homosexual actions with another male," and declared, "I'm not a homo."

After establishing Davis's residential history and inquiring about his sexual orientation, DDA Lewin informed him that Rudolfo Chavez was murdered at the Spic and Span Motel in El Monte on January 7, 1978. Davis acknowledged that the murder

---

[2]     Deputy District Attorney John Lewin and Detective Harry Lewin are not related. To avoid confusion, we refer to Deputy District Attorney Lewin as DDA Lewin and Detective Harry Lewin as Detective Lewin.

occurred during the time he was living near the Spic and Span Motel.

DDA Lewin next told Davis that his fingerprint was found on the inside of the door to the motel room. Davis denied being in the room when the incident occurred. But he suggested that he could have opened the door to the room when he was younger. He repeated later that he might have touched the door when he was "a kid." He also suggested the door was moved from another building. Davis also stated, "This isn't right, man." He also expressed disbelief that his print was discovered and denied killing Chavez.

When shown the crime scene photos, Davis agreed with DDA Lewin that the killing did not appear to be in self-defense based on the number of stab wounds and the amount of blood at the scene. Davis also agreed that the number of stab wounds was excessive to kill. Davis stated, "I couldn't even do that to somebody." He denied having a relationship with Chavez and doubted ever meeting him. Davis stated, "I'm also a thousand percent sure I did not commit that murder, man," and "I would never do that to anybody."

DDA Lewin asked Davis if he could give a reasonable explanation for his print inside the room. Davis responded, "I definitely didn't kill anyone, and I don't know how my print coulda got in there to be honest with you." When asked to assume it was his print, Davis could not give any reasonable explanation for why it was found in the room.

Davis agreed with DDA Lewin that DNA evidence is "very trustworthy." DDA Lewin informed Davis that his DNA was found in the room. DDA Lewin further told Davis that the DNA was found in semen that was on the bedspread that was hanging

from the window.  Davis responded, "Wow.  This is really—there's a mistake here."

DDA Lewin also stated that Chavez's DNA was mixed with Davis's semen.  DDA Lewin commented that the only reasonable explanation was that Davis engaged in sexual activity with Chavez.  Multiple times earlier in the interview, Davis denied ever engaging in sexual activity with another man.  At this point in the interview, DDA Lewin invited Davis to provide any explanations for the evidence against him.  Defense counsel advised Davis to not answer.  Specifically, defense counsel advised Davis to "just listen to what he has to say," "just be quiet," and "don't say anything right now."  He also thanked DDA Lewin for the opportunity to meet and informed him that he would need to consult with Davis.

### 3.  *The Defense Evidence*

Davis relied on the state of the evidence without presenting a defense.

## B.  Procedure

A jury convicted Davis of first degree willful, deliberate, and premeditated murder (Pen. Code, § 187, subd. (a);[3] count 1).

The trial court sentenced Davis to life with the possibility of parole after seven years.  The court awarded 712 days of actual custody credit but denied presentence conduct credit.

---

[3]     All further undesignated statutory references are to the Penal Code.

11

**DISCUSSION**

**A. Sufficiency of the Evidence for Deliberate and Premeditated Murder**

The prosecutor proceeded under the theory that Davis murdered Chavez with deliberation and premeditation. Davis contends that insufficient evidence supported the conviction for deliberate and premeditated murder. We disagree.

Our standard of review is well settled. For a challenge to the sufficiency of the evidence, the record must contain "substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) We review the evidence in the light most favorable to the judgment. (*Zamudio*, at p. 357.) We must "presume in support of the judgment the existence of every fact [the trier of fact] could reasonably have deduced from the evidence." (*Ibid*.) We do not resolve credibility issues or conflicts in the evidence. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

"The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

12

### 1. *Actual Killer*

Davis argues that the evidence supports his mere presence in the motel room.  But Davis was the actual killer.  The substantial evidence to support this determination centers around the physical and scientific evidence.  Davis's fingerprints were found in the motel room where Officer Sperry discovered Chavez's unclothed body.  Davis's DNA was detected in a semen stain on the bedspread in the room, along with Chavez's DNA.  Based on these facts, the jury could reasonably infer that Davis engaged in some form of sexual activity in the company of Chavez.  Further, Chavez's clothing did not contain any damage from the stabbings, supporting the inference that he was stabbed to death while unclothed.

Davis tried to counter this scientific evidence that placed him in the room at the Spic and Span Motel.  He lied to Detective Lewin and again to DDA Lewin about never visiting the Spic and Span Motel.  The Spic and Span Motel was in El Monte.  Davis denied ever living in El Monte.  He recounted the various places he lived with DDA Lewin.  Davis ultimately revealed that from December of 1977 to February or March of 1978, he resided in Temple City, which he confirmed is near El Monte.  Davis lived near the Spic and Span Motel during this brief three-month window in which the killing occurred, despite having lived in a variety of other areas in Los Angeles County and out of state before and after the killing.

To explain the fingerprint evidence against him, Davis suggested that he could have left his fingerprints in the motel room when he was child, or that the door with his fingerprints was moved from another location to the motel.  These incredible

suggestions support Davis's awareness of his guilt of the crime. (*People v. Howard* (2008) 42 Cal.4th 1000, 1024–1025.)

The evidence from the motel room refuted Davis's denial of ever having a sexual encounter with another man.  This denial adds to the other lies Davis told Detective Lewin and DDA Lewin, further supporting his consciousness of guilt.

The totality of evidence, including these highlighted items, amounts to substantial evidence that Davis was the direct perpetrator of the killing.  Where, as here, "the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding."  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

### 2.  *Deliberation and Premeditation*

A willful, deliberate, and premeditated killing is first degree murder.  (§ 189.)  It requires more than a showing of an intent to kill.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*); *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*).)  Premeditated means " 'considered beforehand.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)  Deliberate means " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]" (*Ibid*.)  An intentional killing is deliberate and premeditated if it resulted from "preexisting thought," rather than "rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  "The process of premeditation and deliberation does not require any extended period of time." (*Mayfield*, at p. 767.)

Traditionally, to assess the sufficiency of evidence for deliberation and premeditation, the Supreme Court has established three factors or categories of evidence:  planning activity, motive to kill, and the manner of killing.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27; *People v. Wharton* (1991) 53 Cal.3d 522, 546; *Mendoza, supra*, 52 Cal.4th at p. 1069.) Deliberate and premeditated murder typically entails any one of the following:  (1) extremely strong evidence of planning, (2) a combination of evidence of motive and either evidence of planning or evidence of a calculated manner of killing, or (3) evidence of all three factors.  (*Anderson*, at p. 27; *Wharton*, at pp. 546–547; *People v. Memro* (1995) 11 Cal.4th 786, 863, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

But the Supreme Court has clarified that *Anderson* "did not refashion the elements of first degree murder."  (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)  The *Anderson* factors need not be present in any special combination.  (*People v. Booker* (2011) 51 Cal.4th 141, 173.)  They remain useful to review the evidence.  But establishing them is not required for first degree deliberate and premeditated murder.  (*Koontz, supra*, 27 Cal.4th at p. 1081; *People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

Here, the evidence sufficiently supported deliberation and premeditation based on the manner of killing alone.  Davis stabbed Chavez 45 times.  This sheer number of blows would take time to unleash.  Chavez also sustained defensive wounds. Smears of blood on the walls suggest he was trying to escape or move away from Davis.  Any jury could reasonably conclude this murder did not occur instantly.  Consumption of a length of time sufficient to allow a killer to consider his or her actions supports

15

a finding of deliberation and premeditation.  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.)

Chavez sustained multiple injuries in vital areas including the head, neck, face, abdomen, and back.  The jury could have construed the potentially lethal wounds as demonstrating a preconceived design to kill.  (*People v. Elliot* (2005) 37 Cal.4th 453, 471.)  Such a death resulting from such multiple wounds supports premeditation and deliberation.  (*People v. Morales* (2020) 10 Cal.5th 76, 91; *People v. Pride* (1992) 3 Cal.4th 195, 247.)

Even if a jury determined this killing started as an unplanned event, it could reasonably conclude that Davis's attack on Chavez evolved from an impulsive act to an act rooted in reflection and decision to kill.  The time is not determinative.  The reflection is.  A killer may quickly reach a cold, calculated judgment rapidly after considering thoughts that quickly follow one another.  (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

Concealing the killing or even the condition of the room after the killing supports a killing that was not rash or impulsive. (*People v. Disa* (2016) 1 Cal.App.5th 654, 667.)  Davis placed a bedspread over the window of the room.  He also attempted to clean up the blood as demonstrated by a towel with blood on it. The jury could have reasonably considered these efforts to conceal the activity and clean the scene to infer deliberation.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1128.)

We conclude the record supports substantial evidence of deliberation and premeditation.

**B. Exclusion of Hearsay Statements of An-Chu Shaw**

     **1.** *Additional Background*

El Monte Police Officer Craig Sperry wrote a report that summarized his interaction with Shaw, who was the night manager of the Spic and Span Motel on January 6, 1978. According to the report, Shaw stated that at 11:00 p.m., two men entered the motel office to rent a room. She described one as Latino, about 45 years old, five feet, eight inches tall, with a husky build, black hair, graying at the temples, and very neatly dressed. She described the other man as Latino, in his twenties, about five feet, eight inches tall, and black hair.

Shaw said that the first man inquired about a room rate. When she asked how many people were going to occupy the room, the man indicated he and the other man. She told him the rate, and he paid. The second man filled out a motel room registration card. He pulled out a piece of paper from his pocket and copied information onto the registration card. Shaw provided the key to Room 2. She saw the men go to the room. After a short time, they left, walking southbound toward Valley Boulevard. She did not see them return because she did not remain in the office.

At about 1:15 p.m. on January 7, Shaw went to Room 2 to see if the occupants had left. Checkout time was at 11:00 a.m. When she opened the door, she saw a dead body. Shaw returned to the office and called her husband, who called the El Monte Police Department.

Shaw died prior to Davis's trial. Davis sought to introduce Shaw's statement to Officer Sperry at trial. The trial court excluded Shaw's statement as inadmissible hearsay. The court permitted defense counsel to ask Officer Sperry if Davis fit the physical description of either man described by Shaw. The court

17

also permitted the prosecutor to ask Officer Sperry if he gave Shaw the opportunity to tell him about her ability to perceive the men.

At trial, Officer Sperry testified that Shaw's descriptions of the two men who checked into Room 2 were "entirely different" from Davis as he appeared at trial. Officer Sperry also testified that Shaw did not tell him how far she was positioned from them, whether she paid attention to them, or whether the lighting was good or bad. Shaw was unable to articulate her ability to observe the man with the victim. She was positioned behind a walk-up window in the motel office. Officer Sperry testified that based on his prior visits to the motel office, the lighting conditions at night were not good. Officer Sperry testified that his impression of Shaw was that she did not get a good look at the suspect. He did not ask Shaw how long the men were in front of her, what they were wearing, their hairstyles, or whether she had any difficulty seeing them.

### 2. *Analysis*

Without elaboration, Davis contests the trial court's determination that Shaw's statements constituted inadmissible hearsay. Davis also argues that the exclusion of the statements violated due process, despite their inadmissibility under state evidence law. We reject both arguments.

Shaw's statements were inadmissible hearsay. As determined by the trial court, the statements included the physical descriptors of the two men, their interaction with Shaw, and their subsequent actions. Defense counsel sought to introduce these statements for their truth to present a description of the perpetrator that was different from Davis.

18

The trial court also correctly concluded the statements were not spontaneous under Evidence Code section 1240. No evidence supported Shaw making the statements under stress of the perceived event. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809–810.) No evidence allowed for the court to determine her state of mind. (*Id.* at p. 811.) No other exception permitted admissibility of Shaw's statements.

To support his due process claim, Davis relies on *Green v. Georgia* (1979) 442 U.S. 95 (*Green*), which involved hearsay statements that an accomplice confessed to killing the victim after ordering the defendant to run an errand. The United States Supreme Court determined that the testimony was reliable based on the statements being made spontaneously to a close friend, other evidence corroborating them, and their being against the declarant's interest. The prosecutor had introduced this testimony at the accomplice's earlier separate trial. Under "these unique circumstances," application of the hearsay rule denied a fair trial on the issue of punishment. (*Id.* at p. 97.)

The California Supreme Court explained that under *Green*, exclusion of hearsay testimony at the penalty phase of a capital trial violates due process, if "the excluded testimony is 'highly relevant to a critical issue in the punishment phase,' " and "there are substantial reasons to assume the reliability of the evidence." (*People v. Kaurish* (1990) 52 Cal.3d 648, 704 (*Kaurish*); *People v. Edwards* (2013) 57 Cal.4th 658, 759–760 (*Edwards*).) But the "United States Supreme Court has never suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible." (*People v. Smithey* (1999) 20 Cal.4th 936, 995 (*Smithey*).)

19

Preliminarily, *Green* appears limited to the admissibility of mitigating evidence at the penalty phase of a capital trial. (*Kaurish*, *supra*, 52 Cal.3d at p. 704; *Smithey*, *supra*, 20 Cal.4th at p. 996.)  The statements at issue in *Green* were "highly relevant to a critical issue in the punishment phase." (*Green*, *supra*, 442 U.S. at p. 97.)  "The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence." (*People v. Frye* (1998) 18 Cal.4th 894, 1015, disapproved of on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4.)

We question the applicability of *Green* to the guilt phase of a non-capital trial as reviewed here.  Davis cannot satisfy the first element of *Green*.  Specifically, Shaw's statement is not relevant to a critical issue in the punishment phase of a capital trial.

Davis also fails to satisfy the second element under *Green*. The circumstances under which Shaw observed the two men were unknown.  Specifically, no evidence existed about how well Shaw could see the suspect, whether any circumstances affected her ability to observe, how closely she was paying attention, whether she directly interacted with the suspect, and whether she was under stress during her observations.  Officer Sperry testified that it was nighttime, and the lighting was not good.  According to the prosecutor, Shaw's description of the suspect resulted in a composite sketch of the victim.  We conclude that the statements

lacked reliability based on the limited information about Shaw and the conditions of her observations.[4]

We also reject Davis's further argument that the exclusion of Shaw's statements violated his right to present a defense. The application of the rules of evidence does not generally violate the right to present a defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428.) A violation of this right by an evidentiary ruling must amount to a complete preclusion of a defense. (*Ibid.*) Officer Sperry testified that Shaw's description of the persons who checked into the motel were "entirely different" from Davis's description at trial. Additionally, Davis highlighted the existence of Timothy Heisley as the perpetrator based on the determination that his DNA and fingerprints were found in Chavez's car. This evidence supported the defense theory that Davis was not the perpetrator.

## C. Exclusion of Hearsay Statements of Timothy Heisley

Davis claims the trial court erred in excluding an interview of Timothy Heisley conducted by Detective Lewin and DDA Lewin. The defense sought to introduce Heisley's interview to establish third party culpability. The Attorney General argues that the exclusion did not constitute an abuse of discretion or a constitutional violation. We agree.

---

[4] In the context of the penalty phase of a capital trial, the California Supreme Court has also limited the admissibility of mitigating evidence under *Green* when its exculpatory value is tangential or cumulative of other evidence admitted at trial. (*Smithey*, *supra*, 20 Cal.4th at p. 996; *Edwards*, *supra*, 57 Cal.4th 658 at p. 760.) The trial court admitted the information from Officer Sperry, rendering any additional information about the actual physical descriptors contained in Shaw's hearsay statements cumulative.

## 1. *Additional Background Information*
### a. The interview

In 2019, DDA Lewin and Detective Lewin interviewed Timothy Heisley in Florida. Heisley stated that in 1978, he served in the Marine Corps and was stationed in Tustin, California. He was discharged on June 24, 1978.

Heisley's brother lived in Prescott, Arizona, north of Flagstaff. He recounted a period of time of two or three weekends when he was hitchhiking to Phoenix, Arizona because his car broke down on the way to California from Ohio. He left his car in Phoenix for his brother to fix. Heisley also made a couple of trips to Blythe, California because he established a relationship with a woman there.

Heisley denied ever being in a 1972 Chevy Impala from Los Angeles to Phoenix or Flagstaff. He considered whether he would have traveled in such a car when he was hitchhiking. But he believed he was hitchhiking during the fall of 1976.

Heisley did not know anyone named Anthony Davis. When shown Davis's photo, Heisley denied knowing him.

DDA Lewin informed Heisley about the January 7, 1978, murder at the motel in Los Angeles County. DDA Lewin also told him that a 1972 blue Chevy was found. DDA Lewin further said Heisley's fingerprint was found on the steering wheel, and his DNA was on a Marlboro cigarette. Heisley admitted to smoking Marlboro cigarettes. DDA Lewin also told Heisley that the car was found in Blythe on the day after the murder.

Heisley expressed concern that he was a suspect based on his fingerprint and DNA being found in the car. DDA Lewin assured him that he was not. Heisley asked who the victim was. DDA Lewin told him about Chavez and asked Heisley if he had

ever engaged in sexual activity with other men. Heisley admitted to engaging a "couple of times." DDA Lewin further stated that Chavez picked up a younger individual. DDA Lewin added that he did not believe the younger individual was Heisley.

Heisley remembered one occasion when he was hitchhiking, and the driver had him drive the car for most of the way to Los Angeles. Heisley had been involved in cold weather training as a Marine and missed his helicopter. To return to base by the next Monday, he hitched a ride in Nevada. Heisley did not remember what type of car the man drove. He also could not remember the man's face. The man did not make any sexual advances toward Heisley.

Heisley denied ever going to El Monte. He denied staying in any motel in El Monte, especially on Valley Boulevard where the Spic and Span Motel was located. He denied that the Spic and Span Motel registration card contained his signature.

### b. Other evidence related to Heisley

No evidence connected Heisley to the motel room where the killing occurred. But Heisley's DNA was found on two cigarette butts in Chavez's car. Heisley's fingerprint was also found on the steering column. Heisley's DNA and fingerprints were not on the envelope that contained Chavez's blood. His DNA and fingerprints were not found on any other item in the car that would have been taken from the motel room.

### c. Trial court rulings

The trial court excluded Heisley's interview with Detective Lewin and DDA Lewin. The court ruled that defense counsel could impeach Detective Lewin with his decision to not further investigate Heisley as a suspect. The court also permitted testimony about the nature of the questions Detective Lewin

asked of Heisley.  The court did not allow the defense to introduce any of Heisley's specific statements through Detective Lewin.  The court permitted defense counsel to argue that Heisley was a viable suspect and law enforcement chose not to follow up with investigation of him and instead focused on Davis.

### d.  Testimony and evidence introduced at trial

Heisley did not testify at trial.  Neither the defense nor the prosecutor served him with a subpoena to testify.

At trial, Detective Lewin testified that he met with Heisley in Florida.  At Detective Lewin's request, Heisley had previously consented to providing a DNA sample to law enforcement officers in Florida, where he lived.

Detective Lewin learned that Heisley's fingerprints were in Chavez's car.  Fifteen cigarette butts were found in the car.  Heisley's DNA was on two menthol cigarette butts in the car.  Detective Lewin's investigation did not reveal when the cigarette butts were placed in the car.  He was not able to determine when Heisley was in the car.  Some menthol cigarettes were found in the motel room.  Detective Lewin learned that Chavez was not a smoker.

According to Detective Lewin, Chavez's car was reported outside of Phoenix, Arizona at about 3:00 or 4:00 p.m. on the day after the killing.  Detective Lewin discovered that one of Chavez's credit cards was used in Blythe to get gas.  Blythe is on the way to Phoenix.  The signature for "Rudy Chavez" was signed on a receipt.  Detective Lewin did not compare the writing with Heisley's writing.  Detective Lewin made up his mind that Davis, not Heisley, killed Chavez when he learned that his DNA and fingerprints were found in the motel room.

Detective Lewin asked Heisley if he was involved in the murder, why his DNA was found in the car, whether he was involved in sexual activity with other men during the time of the incident, whether he was stationed in the Los Angeles area for military service during the time of the incident, and whether he went to Arizona during the time after the incident. Detective Lewin also asked him questions about the physical evidence in the car. Heisley was cooperative during the interview with Lewin. Heisley was never evasive when Lewin asked him questions.

Detective Lewin learned that envelopes with Chavez's blood were found in the car. Detective Lewin found no evidence that Heisley's fingerprints were on any bloody items in the car. He also learned that Heisley's DNA was not included in any items in the motel room. There was no evidence of Heisley ever being in the motel room. Lewin ruled out Heisley as a perpetrator solely because his DNA was not in the room. As a result, Detective Lewin terminated his investigation of Heisley as a suspect.

### 2. *Analysis*

The trial court correctly determined that Heisley's statements were inadmissible hearsay, like Shaw's statements to Officer Sperry. Defense counsel sought to introduce Heisley's interview for the truth of his statements regarding his connection to Blythe where Chavez's credit card was used, his connection to Arizona where Chavez's car was found, his time spent in the Los Angeles area around the time of the murder, and his admission to engaging in sexual activity with other men. Because no exception to the hearsay rule applied, the trial court did not abuse its discretion in excluding the statements.

25

Without much elaboration, Davis also argues that the exclusion of Heisley's statements was fundamentally unfair under *Chambers v. Mississippi* (1973) 410 U.S. 284, 302–303. But unlike the trial court in *Chambers*, the trial court here did not prevent Davis from calling Heisley as a witness. Heisley was available to testify. But neither party served him with a subpoena to testify. The trial court did nothing to deny Davis due process or render his trial fundamentally unfair. (*Id.* at p. 303.)

## D. Defense Counsel's Statements During the Interview with DDA Lewin

The prosecution introduced Davis's interview with DDA Lewin. Detective Lewin, Detective Falicon, and Davis's attorney also attended the interview. The interview included DDA Lewin asking Davis questions about where he lived in the past and his sexual orientation. DDA Lewin also informed Davis about the evidence collected during the investigation of the murder. After DDA Lewin concluded, he offered Davis an opportunity to provide explanations for the evidence against him. Defense counsel interjected and spoke with DDA Lewin.

The trial court excluded several of defense counsel's statements made during the interview at his request. The trial court expressed concern that these statements contained defense counsel's opinion about limiting the defense theory to the absence of malice or the existence of a justification because of the DNA and fingerprint evidence that pointed to Davis as the perpetrator.

Davis argues that the trial court improperly admitted other statements made by defense counsel.[5]  Davis claims that the

---

[5]     When DDA Lewin invited Davis to provide explanations for the evidence against him, defense counsel began responding with the following statements which Davis now flags:

"I understand your position.  Totally.  There's DNA and there was a fingerprint.  And the DNA indicates some type of sexual activity.  I get it."

"[W]hat I'm saying is that, you know, based upon this, I can certainly understand the deep concern that the District Attorney's Office has in this matter.  This is not a fishing expedition.  I get it."

"He does not have an explanation other than to say that it wasn't him, that it's a mistake.  You may not consider that a viable explanation."

"I've had a very significant amount of experience with DNA [¶] . . . [¶]  I know how potent it is. [¶] . . . [¶]  Much more than a fingerprint."

"I understand where you are coming from and maybe at this time, you know, in other words, now that I see the significance of your case— [¶] . . . [¶] — give me time to talk to my client.  You know, in other words— [¶] . . . [¶] –give me one or two days to talk to him—because, uh—you know, uh, I know—I understand.  [¶] . . . [¶] All right.  I understand."

"I wanna see what, if anything, may have transpired or not.  Uh, he's in a tough emotional state right now as anybody would be— [¶] . . . [¶] —looking at the most powerful two pieces— [¶] . . . [¶] —of evidence that you could possibly imagine.  [¶] . . . [¶]

27

All right.  If that's the reality of it, especially the DNA, that's mixed."

"So I need to talk to him, uh, about certain realities.  [¶] . . . [¶]  This case—and I understand it—is gonna be filed.  You know, it—one way or the other it's gonna be filed.  I get it.  [¶] . . . [¶]  You told me in advance. [¶] . . . [¶]  So I understand that."

"[Davis:]  Isn't there a way we can do another DNA test?"

"No.  Hold on just—.  Hold on.  We'll talk about that later but first we're going to talk.  We now understand the gravity of the case.  [¶] . . . [¶]  And we're also going to be given an opportunity, if it's viable, to give an explanation.  We may not have an explanation but we appreciate this opportunity.  We see how serious."

"All right. Now, you're facing reality.  You're facing their evidence.  Okay?  This is it.  This is not some joke. [¶] . . . [¶]  It's not some— [¶] . . . [¶] conspiracy, okay?"

"[Davis]:  It's worse than I could have ever even imagined."

"That's right. . . .  I understand where you're coming from.  [¶] . . . [¶]  I appreciate this opportunity.  Um, reality has to set in."

"I'm looking at 44 wounds.  [¶] . . . [¶]  And that's rage.  [¶] . . . [¶]  You know, I mean, let's—you know, that's—that's a whole different ball game.  This is one— [¶] . . . [¶] [N]ot one or two wounds. [¶] . . . [¶]  All right.  So there's—it's a whole

28

statements led the jurors to believe that the trial proceeded only because of his failure to provide suitable answers to the prosecutor during the interview.  Davis also asserts these statements amounted to defense counsel expressing his belief that he was guilty.

We reject both arguments.

---

different animal here.  All right.  And I understand that.  So I have to talk to him about this, uh—you know, I've—I've—I grew up in that time period. [¶] . . . [¶]  I understand the mentality."

"And—and now we—we—we—truly appreciate the severity of the evidence and why, uh—why this thing is proceeding this way.  [¶] . . . [¶]  It is.  This is not a conspiracy.  This is not anger towards you. They are going on scientific evidence….  [¶] … [¶]  All right.  They don't know—they don't know how it started.  They don't know what, you know, they— they are just looking at the evidence."

"You have been honest with me from the very beginning.  You didn't tell me specifically—what it was. Of course that's a strategic decision."

"It's my opinion that you will accept that explanation if it's reasonable and honest.  If it's not reasonable and honest, you'll reject it.  [¶] . . . [¶] You know, it's—it's just that simple.  You know?"

"All right.  I understand your position, all right?  And I respect it.  All right?  I—you know, I just need to speak to him; in other words, it's one thing to have a fingerprint.  [¶] . . . [¶]  It's another to have DNA."

First, the District Attorney proceeded to trial because of the incriminating evidence against Davis, not because of any failure to respond to DDA Lewin's presentation of that evidence. DDA Lewin informed Davis that based on the evidence he had collected, he intended to file a murder case. By suggesting defense counsel's statements influenced the jurors, Davis ignores the first three-quarters of the interview comprised of DDA Lewin's presentation of the evidence and his reactions. During this portion of the interview, Davis admitted to living near El Monte and the Spic and Span Motel at the time of the murder. His denials of any previous sexual encounter with other men and any previous visit to the Spic and Span Motel were contradicted by the DNA and fingerprint evidence highlighted by DDA Lewin. Davis's incredible suggestion that he might have touched the motel room door when he was a child further exposed his consciousness of guilt.

Second, the statements did not express defense counsel's belief that the DNA and fingerprint evidence was irrefutable or that Davis was guilty, as he now claims. The statements were made near the end of the interview when DDA Lewin invited Davis to provide explanations for the evidence. Defense counsel merely wanted to conclude the interview before Davis made any incriminating statements. This goal is supported by defense counsel telling Davis, "[R]ight now we're here to listen." At multiple points, defense counsel also interrupted or cut off Davis by telling him to "be quiet."

Defense counsel's references to the strength of the evidence were not his endorsement of it. He was merely acknowledging DDA Lewin's assessment of the evidence. At multiple points, defense counsel states, "I can certainly understand the deep

concern that the District Attorney's Office has," "I get it," "I understand where you are coming from," and "I understand your position." We can reasonably infer that defense counsel believed DDA Lewin would not change his mind, even if Davis provided explanations. DDA Lewin already expressed his confidence in the evidence. He stated, "there is zero question in my mind— zero—none—you killed this guy." Defense counsel had nothing else to immediately offer and had every incentive to conclude the interview.

The trial court did not abuse its discretion in admitting defense counsel's statements when viewed within the context of the entire interview and interpreted as mere observations of the prosecutor's assessment of evidence. Nor did their admission violate due process for these reasons. We conclude the jurors would not have necessarily drawn the impermissible inferences suggested by Davis, that is, defense counsel believed he was guilty, and his trial proceeded because he was unable to provide reasonable explanations for the incriminating evidence. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 230.) The admission of the statements did not render Davis's trial "fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

### E. Prosecutorial Misconduct

Davis complains that the prosecutor committed misconduct on multiple occasions throughout the trial. A prosecutor's misconduct violates the Fourteenth Amendment when "it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*); *People v. Thomas* (2012) 54 Cal.4th 908, 937; *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) Under California law, prosecutorial misconduct involves the use of "deceptive or

31

reprehensible methods to attempt to persuade . . . the jury."
(*Morales*, at p. 44; *People v. Otero* (2012) 210 Cal.App.4th 865,
870; *People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071.) We
address the prosecutor's acts and conclude that none amounts to
misconduct under federal or state law.

### 1. *Appealing to the Sympathy of the Jury*

Davis first claims the prosecutor improperly appealed to
the sympathy of the jurors twice. First, during opening
statement, the prosecutor presented Chavez's photographs of
when he was alive and after he was "brutally murdered." Second,
the prosecutor elicited testimony that Chavez was murdered a
day before his birthday.

The prosecutor did not deceptively introduce the
photographs to commit misconduct under state law. She sought
and received the trial court's approval for the presentation of the
graphic photograph of Chavez. She apologized to the jurors for
the graphic nature of the photograph. But she also explained the
purpose of presenting it was to show the motive for the killing.
She stated that robbery was not the motive because a gold watch
and a gold chain remained on Chavez as depicted in the
photograph.

The combination of photographs could not have evoked
undue sympathy for Chavez or prejudice against Davis to
constitute misconduct under federal law. The trial court
instructed the jury with CALCRIM No. 200. We presume the
jurors followed this instruction to not let bias, sympathy, or
prejudice influence their decision. (*People v. Daveggio and
Michaud* (2018) 4 Cal.5th 790, 861–862.)

### 2. *Misstatements*
#### a. Motel registration address

Davis next argues that the prosecutor improperly stated that Davis created a fictitious address by using his name as the street name for the motel registration card.  Davis maintains that he was not the person who wrote on the registration card based on Shaw, the Spic and Span Motel night manager, describing that person's height and race differently from his height and race.  According to Davis, the handwriting on the registration card also did not match his handwriting.  Davis explains that the prosecutor's knowledge of these facts prohibited her from claiming he created the fictitious address on the registration card.  (*People v. Warren* (1988) 45 Cal.3d 471, 480.)

The prosecutor's statement was not baseless for several reasons.  First, the street name used was Davis.  Second, Shaw's description of Chavez's companion at the check-in did not completely exclude Davis as the person who wrote on the registration card.  Shaw never identified someone other than Davis as the man who occupied the room with Chavez.  The prosecutor maintained that Shaw was merely mistaken in describing the height and race of the man suspected to be Davis.  Finally, the analysis of the handwriting on the registration card did not exclude Davis as the person who wrote on the card, as he now argues.  The analysis was merely unable to determine whether it was Davis's handwriting.

#### b. Absence of Heisley's DNA in the motel room

Davis also argues that the prosecutor misstated that no evidence supported Heisley ever being inside the motel room.  Specifically, in opening statement, the prosecutor said that the detectives "went to get a DNA sample from Tim Heisley and had

it tested against all of the evidence in the room; and there is no evidence, not a trace of Timothy Heisley ever being in that motel room. He was excluded from every single sample in that motel room."

The prosecutor's statements are not inaccurate. Heisley was excluded as a contributor from every DNA sample obtained in the room. Heisley's reference DNA sample was compared against only the other DNA samples obtained from the evidence and his DNA was not included in any of those samples. Implied in the prosecutor's statement is the fact that Heisley's DNA could only be compared against evidence from which a DNA sample was found. It could not be compared against the missing or lost evidence or any other evidence from which DNA samples were not obtained. Understandably, DNA samples were not obtained from the missing evidence. By the time the DNA testing occurred, the evidence was already missing.[6]

Some of the other evidence was not tested for DNA. Davis points out the prosecutor did not account for the possibility of Heisley's DNA in four out of five bodily fluid stains on a bed sheet. But the analyst Lajoie found no DNA on the epithelial fraction and sperm fraction for one sample out of the five bodily fluid stains on the bed sheet. She did not test for DNA on the remaining bodily fluid stains because of the negative DNA result on the one sample.

---

[6]    According to Lajoie, DNA technology for forensic science did not exist in 1978.

### c. Two persons engaging in a sexual act

Davis similarly argues that the prosecutor improperly limited the occupants of the room to two persons and stated they engaged in sexual activity.  We disagree.

The prosecutor's statements did not limit the number of persons in the motel room, as Davis claims they did.  Instead, the prosecutor clarified that Davis and Chavez were the only two persons who satisfied two conditions:  they were connected to the room by scientific evidence, and they were connected to sexual activity in that room.  She did not mention any other contributor of DNA evidence, but she also did not affirmatively exclude the possibility of one.

The jurors could reasonably infer the sexual activity from the existence of Davis's semen on the bedspread and Chavez's unclothed condition.  The jurors could further infer Chavez was unclothed prior to the stabbing based on the absence of stab marks on his clothes.  Drawing the inference of sexual activity does not require Davis's seminal fluid or spermatozoa on Chavez's anal or oral cavity or Chavez's seminal fluid in the room, as Davis claims.  The absence of Davis's DNA on Chavez's body does not necessarily refute the possibility of sexual activity either.  As Lajoie stated, DNA left by touch does not withstand time as well as DNA in sperm cells or blood.

### d. Clean up of the crime scene

Davis argues that the prosecutor improperly told the jury, "You heard that there was a towel with blood on it as though somebody had tried to clean up."  In Davis's interview, DDA Lewin mentioned a bloody wash towel that was found on top of the dresser in the room.  But no evidence supported the existence of this bloody wash towel.

The reference to the bloody towel was not prejudicial.  The jurors are presumed to have followed the court's instruction that the attorneys' comments are not evidence.  (*People v. Hinton* (2006) 37 Cal.4th 839, 863 (*Hinton*).)  Additionally, the prosecutor referenced the bloody towel during her argument that Davis's actions supported a calculated decision.  Included in this argument was a discussion of the bedspread hung over the window to conceal the crime.  The jurors could reasonably infer from this evidence alone that Davis had the state of mind described by the prosecutor.

### e. Alleged undisclosed evidence known only to DDA Lewin

Davis claims the prosecutor insinuated DDA Lewin's decision to not pursue Heisley as a suspect was supported by undisclosed evidence known only to him.  But she did not insinuate anything.  The prosecutor merely confirmed that the case was not filed against Heisley after Detective Lewin and DDA Lewin interviewed him, interviewed Davis, and reviewed the evidence.

### f. DNA evidence

Davis appears to argue that the prosecutor misstated two points about the DNA evidence.  First, Davis asserts that she incorrectly stated that his DNA was mixed with Chavez's DNA in a manner not supported by the evidence.[7]  Second, he alleges the prosecutor improperly equated the likelihood ratio for the DNA profile in the semen sample to Davis's guilt.  We reject both arguments.

---

[7]     Davis does not specify where the prosecutor makes this statement.  He did not include a page citation in his brief.

Davis appears to interpret the prosecutor's statement to mean that his semen was mixed with Chavez's blood in such a manner that they were deposited near the same time. In his brief, he states, "it was not possible to determine forensically . . . if the DNA was deposited in an overlapping fashion at different times." But the prosecutor did not say anything about the timing of deposit for either the semen or any other substance.

The prosecutor also did not inaccurately summarize the likelihood ratios of any profile. Analyst Lajoie testified that the bedspread had multiple bloodstains. One area of the bedspread produced positive results for sperm on three separate tests. From this area, Lajoie extracted sperm cells and epithelial cells. She determined that Davis was a contributor.

Davis contends the prosecutor misrepresented the DNA results in referencing the likelihood ratio. He does not elaborate but cites as an example *McDaniel v. Brown* (2010) 558 U.S. 120, 128, and parenthetically notes that a prosecutor may not "equate DNA frequency statistics . . . to the quantitative probability that the defendant is or is not the source of the DNA, or is or is not guilty." *Brown* addressed the so-called "prosecutor's fallacy," that is, "the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." (*Ibid*.)

But the prosecutor did not improperly discuss any of the likelihood ratios of the DNA profiles. Lajoie testified that the likelihood ratios represent the level of support for inclusion of a person's DNA profile against the tested sample. The degrees of support of inclusion are limited support, moderate support, strong support, and very strong support. The degree of support is determined by the numerical value produced by the likelihood

37

ratio. It compares two opposing explanations and asks, "Is it likely that this explanation is true versus another explanation is true?"

First, Lajoie determined that the likelihood ratio for the DNA profile for the sperm fraction of the sample from the bedspread was approximately "two times ten to the twenty-fifth times" more likely if it originated from Davis and an unknown individual than if it had originated from two unknown individuals. This was considered a very strong level of support.

Next, Lajoie testified that the likelihood ratio for the DNA profile for the epithelial fraction of the sample was approximately "four times ten to the fifteenth times" more likely if it had originated from Davis and two unknown individuals than if it had originated from three unknown individuals. This was also considered the highest level of support.

In closing argument, the prosecutor's statements included the findings that the likelihood ratios for the sperm fraction and epithelial fraction produced the highest level of support of inclusion for Davis. [8] These statements were consistent with Lajoie's testimony.

---

[8] But the prosecutor misstated the number representing the likelihood ratio for the sperm fraction was "somewhere above four trillion times" more likely to be Davis than anybody else. The number represented by Lajoie was "two times ten to the twenty-fifth times" more likely. This number is 26 digits, or "twenty-five zeroes after [the two]." The four-trillion-figure used by the prosecutor is 13 digits, or "twelve zeroes after the four." This is a much smaller number. The mistake is of no consequence. The prosecutor's number and Lajoie's number both fall under the category of highest level of support for inclusion.

### 3. *Comments About Defense Counsel and Stereotypes*

Davis complains about the prosecutor stating he was "homosexual because he never married." Davis also flags the prosecutor's comments that defense counsel was "just doing his job," and "talking out of both sides of his mouth." The prosecutor also stated that defense attorneys, including counsel for Davis, "have to work with the hands they are dealt with." These comments did not constitute misconduct.

None of the statements about defense counsel were inflammatory. Prosecutors are afforded latitude to describe deficiencies in defense counsel's tactics and recitation of the facts. (*People v. Benmore* (2000) 22 Cal.4th 809, 846.)

Similarly, the prosecutor did not say anything objectionable about Davis's marital status. During his interview with Detective Lewin, Davis introduced the stereotype that persons with a same-gender sexual orientation are unmarried. The prosecutor merely quoted Davis, who stated, "I'm a total heterosexual male even though I am not married."

### 4. *Laundry*

Davis complains that in closing argument, the prosecutor "introduced a theory that DNA may be diluted by laundering and then proceeded to attack that theory in closing argument insinuating that Davis had introduced it." But the prosecutor never argued that DNA evidence would be diluted by laundry.

The subject of laundry was first raised only as it related to the existence of sperm, not DNA, on bedding. In opening statement, defense counsel tried to argue the impossibility of determining when the sperm cells found to have Davis's DNA were deposited. Defense counsel, not the prosecutor, introduced the idea of the sperm cell's resilience to laundry.

In closing argument, the prosecutor began to discuss the idea of sperm cells transferring from items in laundry. But she reduced this argument to a reference to Lajoie's findings that dispelled the possibilities of transferring sperm or diluting semen. [9] We see no improper argument.

### 5. *Cross-racial Identification*

Davis also contends that the prosecutor argued about cross-racial identification without the support of expert testimony.

The prosecutor's reference to cross-racial identification is unclear. After commenting on the absence of information related to the conditions of Shaw's observations, the prosecutor stated, "There was cross-racial—this identification." Her statement was incomplete and ambiguous. Shaw never identified anyone. The jurors heard Shaw was Asian. They saw Davis is not. But they never learned the race of the suspect as described by Shaw. More importantly, the statement hardly expresses the effect of the different races of the witness and the suspect on the accuracy of the witness's identification of the suspect, as is typically explained by an eyewitness identification expert.

---

[9] Earlier in the trial, the prosecutor elicited Lajoie's testimony about transferring semen from one item of bedding to another from laundry. According to Lajoie, sperm cells can transfer but the acid phosphatase, which is the enzyme in the semen, would not transfer. In other words, the acid phosphatase does not follow the sperm cells as they go to the other item.

Lajoie also testified to the research for when an item with semen was laundered. According to Lajoie, the fluorescence from the alternate light source test would be gone, the acid phosphatase would be slightly reduced, and the sperm cell rating would be reduced from a "three-plus rating" to a "one-plus or a zero" rating.

As stated, the court repeatedly instructed that nothing the attorneys say is evidence. (CALCRIM No. 222.) This instruction dispelled any prejudice. (*Hinton*, *supra*, 37 Cal.4th at p. 863.) The jury was free to reject the prosecutor's reference to the term cross-racial, especially given its ambiguity.

### 6. *Exercise of Constitutional Rights*

#### a. Failure to provide explanation

Davis complains the prosecutor improperly commented on his exercise of constitutional rights. Without elaboration, Davis refers to the prosecutor's comment during opening statement about his failure to provide DDA Lewin with a reasonable explanation for the incriminating evidence against him.

The prosecutor did not violate the Fifth Amendment prohibition on commenting on a defendant's decision to not testify under *Griffin v. California* (1965) 380 U.S. 609, 613. (*People v. Taylor* (2010) 48 Cal.4th 574, 632.) The prosecutor commented on Davis's failure to provide reasonable responses to incriminating evidence in his interview with DDA Lewin, not on any decision not to testify. The interview with DDA Lewin constituted a voluntary, non-custodial pre-arrest interview. The prosecutor's comments did not constitute misconduct.

#### b. Failure to provide DNA and fingerprint samples

Next, Davis contends the prosecutor committed misconduct by eliciting testimony that he refused to voluntarily provide a DNA sample and arguing that the refusal supported his consciousness of guilt. He explains that the prosecutor improperly commented on his exercise of his Fourth Amendment right to be free from a warrantless search for DNA extraction and fingerprint impressions.

41

We agree.  The prosecutor improperly used Davis's exercise of his Fourth Amendment right to show he had something to hide.  (*People v. Wood* (2002) 103 Cal.App.4th 803, 809 (*Wood*).)  The prosecutor suggested Davis should be punished for requiring Detective Lewin to obtain a search warrant for the samples.

We review a federal constitutional error—including an improper comment of an assertion of a constitutional right—under the harmless beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18, 24.  (*Wood, supra,* 103 Cal.App.4th at p. 810.)  We "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error."  (*People v. Merritt* (2017) 2 Cal.5th 819, 831.)

The error here was harmless beyond a reasonable doubt.  Davis's initial refusal to voluntarily provide a DNA sample was followed by his full cooperation with providing a sample and fingerprints pursuant to a court-approved search warrant.  Davis's ultimate cooperation mitigated any hint of earlier reluctance.

The DNA evidence against Davis was so strong that the exclusion of the fact that he refused to voluntarily submit a DNA sample would not have made the jury any less likely to conclude that his DNA was present in the sperm and epithelial fractions on the sample taken from the bedspread inside the motel room.  The remainder of the DNA evidence was equally strong.  Part of it even benefited Davis by excluding him from Chavez's car.  Davis did not submit any expert testimony to counter Lajoie's findings.  Nor did he present any other evidence from which the jury could have found fault with Lajoie's analysis.

Additionally, Davis revealed his consciousness of guilt in other ways that were distinct from his assertion of his Fourth Amendment right.  For example, he falsely denied ever being at the Spic and Span Motel.  He also offered incredible explanations for his fingerprint being inside the room, such as suggesting that he touched the door when he was a child, and that the door was moved from another building which he had occasion to enter.  These statements conveyed a more damaging consciousness of guilt than the improperly admitted evidence about his reluctance to voluntarily provide samples.  Scientific evidence contradicted the false statement denying his prior visit to the Spic and Span Motel and alternative explanations for his fingerprints in the room.  We consider the improperly admitted evidence cumulative of the properly admitted evidence on the issue of consciousness of guilt.

We conclude that the evidence concerning defendant's refusal to voluntarily provide samples and the prosecutor's comment on that evidence did not contribute to the guilty verdict and was harmless beyond a reasonable doubt.  Moreover, the comment did not infect the trial with unfairness, nor do we consider it deceptive or reprehensible to rise to the level of prosecutorial misconduct under federal and state law, respectively.  (*Morales*, *supra*, 25 Cal.4th at p. 44.)

## F.  Lost Evidence

Davis contends the trial court violated his due process right by denying his motion to dismiss for failure to preserve evidence, his alternative request for an adverse inference jury instruction, and his motion for new trial.  We disagree.

43

### 1. *Additional Background*

Prior to February 18, 2018, Detective Lewin discovered that multiple items of evidence collected from the motel room in 1978 were missing. The prosecutor disclosed this information to defense counsel prior to trial commencing.

Davis moved to dismiss the case for failure to preserve evidence. Davis alternatively requested a jury instruction related to the loss of evidence. The trial court denied the motion and the request.

At trial, the prosecutor and defense counsel stipulated that the specific items were booked into evidence and subsequently lost.[10]

---

[10]    The parties stipulated:

"[T]he following items were listed as recovered from room no. 2 of the Spic and Span Motel by Sergeant Latimore in his report, dated June 14, 1978: item 1, one black and white business card with the victim's name on it; item 2, book of matches with the name Great Western on it; item 3, one empty 12-ounce Schlitz beer bottle; item 4, one Salem cigarette; item 5, six dimes in U.S. currency; item 6, miscellaneous cigarette butts; item 7, one paper sack with bloodstains containing four full 12-ounce Schlitz bottle[s]; item 8, one piece of blue and white tape with the name Q and Q [*sic*] Publishing; item 9, one black sock, size 10 1/2 to 11 medium; item 10, one blue tie with yellow metal clasp; item 11, one ballpoint pen. [¶] These items were booked into evidence under [a] case file number with the L.A. County Sheriff's Department. A search for the

After the guilty verdict, Davis moved for a new trial based on the failure to preserve evidence. The trial court denied the motion for new trial.

## 2. *Analysis*

The requirements to establish a due process violation for the failure to preserve evidence depends in part on the significance of the evidence to the defense. Under *California v. Trombetta* (1984) 467 U.S. 479, due process requires the state to preserve "evidence that might be expected to play a significant role in suspect's defense." The evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at pp. 488–489.)

Failure to preserve evidence that was merely potentially useful does not constitute a denial of due process unless the defendant can show bad faith by the police. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58.) Bad faith is not required under *Trombetta.* (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773 (*Alvarez*).)

We review the trial court's denial of a *Trombetta/Youngblood* motion under the substantial evidence standard. (*People v. Montes* (2014) 58 Cal.4th 809, 837; *Alvarez, supra*, 229 Cal.App.4th at p. 774.) We review the record in the light most favorable to the prosecution to determine whether it discloses substantial evidence in support of the trial court's

following items revealed they were subsequently lost: items 3, 4, 5, 6, 7, 9, 10, and 11."

45

decision.  (*Montes*, at p. 837; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Defense counsel conceded that the law enforcement officers did not lose the items in bad faith.  Even if the lost evidence was potentially useful, Davis cannot prevail because he cannot show bad faith on the part of the law enforcement agency.

There is also no way of determining if the items were potentially useful or if they possessed an exculpatory value. Davis cannot show the lost evidence possessed an exculpatory value that was apparent before the evidence was lost.  No evidence supports whether a DNA sample could have been extracted from the missing evidence and whether it would have been exculpatory if it could have been extracted.  We conclude that substantial evidence supports the trial court's ruling.

## G.  Cumulative Error

The aggregate prejudice from the alleged multiple errors could require reversal even if no single error was itself prejudicial.  (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  Under the cumulative error doctrine, we must review each challenge and evaluate the cumulative effect of any errors to determine " 'if it is reasonably probable the jury would have reached a more favorable result to the defendant in their absence.' "  (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  Reversal is required when the cumulative effect of errors deprives the defendant of a fair trial.  (*Ibid.*)

We have determined one error existed with the prosecutor's comment and her elicited testimony about Davis's refusal to voluntarily submit a DNA sample and fingerprints.  As discussed, this error was harmless and did not deprive Davis of due process or a fair trial.  The prosecutor's improper comment about the

46

bloody towel was also not prejudicial.  We also concluded that no prejudice resulted even if we assumed error by the prosecutor's vague reference to the term cross-racial when discussing Shaw's description of the perpetrator.  We rejected Davis's other allegations of error.  We must reject Davis's cumulative error argument.  (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 63.)

**H.  Presentence Conduct Credits**

Davis challenges the trial court's refusal to award any presentence conduct credit.  But Davis was not entitled to any presentence conduct credit because at the time of the commission of the offense in 1978, no statute provided for awarding life prisoners with conduct credits.  (*People v. Garcia* (1981) 115 Cal.App.3d 85, 113 (referencing former § 190, Stats. 1977, ch. 316, § 5, pp. 1256–1257).)  "Former section 190 provided sentences of straight life imprisonment only for those persons convicted of first degree murder" like Davis.  (*Garcia*, at p. 114.)  The trial court correctly denied presentence conduct credit.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.*


We concur:



EDMON, P. J.



ADAMS, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

48